698 So.2d 1051 (1997)
STATE of Louisiana, Appellee,
v.
Harold Lee JOHNSON, Appellant.
No. 29629-KA.
Court of Appeal of Louisiana, Second Circuit.
August 20, 1997.
Rehearing Denied October 23, 1997.
*1052 Geary W. Aycock, for Appellant.
Richard Ieyoub, Attorney General, Jerry L. Jones, District Attorney, J. Michael Ruddick, Assistant District Attorney, for Appellee.
Before MARVIN, C.J., and NORRIS and CARAWAY, JJ.
NORRIS, Judge.
Indicted for the second degree murder of Inez Smith in 1990, Harold Lee Johnson proceeded to trial in January 1992 and was found guilty as charged. The District Court sentenced him to the mandatory life in prison at hard labor without benefit of parole, probation or suspension of sentence. Johnson now brings this out-of-time appeal, advancing three assignments of error. For the reasons expressed, we affirm.

Factual background
On October 26, 1990, the defendant's brother, James "Cookie" Johnson, was viciously beaten by a group of men at the Blue Light Cafe in Monroe, also known as "John H's club." The victim could provide no motive for the assault; however, he believed that his assailants were members of the "White Street Gang." He testified that because of the beating he was hospitalized at LSU-MC for two months.[1]
The Johnson family called the defendant, Harold Johnson, in San Diego, California, where he was staying at the time. Hearing what had happened to his brother, Johnson took a bus to Louisiana and visited him in the hospital. James told his brother the names of the alleged gang members who had beaten himVictor Kelly, his friends David Davis and Paul Jasperamong others. The defendant testified that seeing his brother so badly beaten made him want revenge against the perpetrators.
On November 2, 1990, several days after the hospital visit, Johnson gathered a group of friends in Monroe and went to John H's with the intent to attack the gang that beat his brother. Johnson's cohorts armed themselves with baseball bats and similar weapons; he himself carried a .22 pistol. Johnson claimed that he did not intend to shoot any of the gang members but brought his gun because he knew the gang would be armed.
Johnson's group arrived at the club sometime after 1:00 a.m. They spotted a car in the parking lot they believed to belong to David Davis; they smashed out its windows and headlights. Johnson then walked into the club in search of the alleged gang members.
Once inside, Johnson spotted Paul Jasper and David Davis; Victor Kelly was not present. Believing that Jasper had been involved in his brother's beating (a point which Jasper denied at trial), Johnson slapped him at least once in an effort to provoke him. Jasper saw that Johnson was armed so he ignored him.
Getting no response from Jasper, Johnson turned to David Davis, whom he identified as "Ponytail" and a White Street Gang member who had participated in James's beating. At trial Davis denied being a gang member, knowing anyone who was a gang member, and having any involvement in the beating; he implied that Johnson might have mistaken him for someone else with a similar name. (Johnson's cousin, James Williams, also held *1053 this opinion at one time. R.p. 310.) Davis had been outside and, seeing the group of men armed with sticks and boards, decided to return to the club.
Testimony about the next events differed considerably. Testifying for the State, Davis said that as he stood in the doorway to the club, Johnson stood just outside the door and advised him that somebody had "messed up" his car and he needed to "check it out." When Davis refused to go back outside, Johnson pulled a revolver, pointed it at him and pulled the trigger. The gun misfired with the first pull, and Davis jumped back into the bar. Johnson then fired two or three shots into the bar, evidently meant for Davis. Davis testified that he did not have a firearm, and Paul Jasper corroborated this. R.pp. 258, 264, 272.
Another State witness, Larry Jackson, testified that he did not see a gun in Davis's hand. Jackson was an "acquaintance" of Davis's and, at the time of the trial, was incarcerated for a pending drug charge. R.p. 384.
Johnson's cousin, James Williams, testified for the State that he accompanied Johnson and his friends to John H's in order to beat up the gang members. Williams said Davis had the reputation for carrying a firearm. He did not see Davis with a firearm that night, but saw Davis pull his hand from his pocket just before Johnson began firing. He denied that he yelled anything like "Look out!" to Johnson. R. Pg. 333.
Johnson's account was that after he failed to provoke Jasper, he decided to leave the club. He admitted that he planned to "wait around and catch him [Davis] on the street." R.p. 481. Johnson walked past Davis in the doorway and, as he left the club, he heard someone (he thought it was his cousin) say, "Look out!" Johnson turned around and saw Davis with a pistol in his hand; he therefore drew his own weapon and fired three shots at Davis in self-defense.
Terry Davis, another of Johnson's cohorts that evening, testified that he witnessed the encounter and, after he heard somebody say "Watch out!," saw David Davis with a gun in his hand. Curiously, Terry Davis had never disclosed this detail to the police or to anyone else until the trial. R.p. 439.
Monroe police officer Larry Matthews testified that he was familiar with Davis, who had a reputation as a drug dealer who carried a gun. R.pp. 407-408. Officer Matthews said that Paul Jasper and Victor Kelly were also known to be drug dealers. The officer was not familiar with the "White Street Gang" but said that the area around John H's club was the "turf" of Davis, Jasper and Kelly who were a "group," not a gang. R.pp. 406, 408-409.
This officer also testified that Johnson had once bragged that he was "an east coast gangster" and a member of the Crip street gang; the department had confirmed this information. R.pp. 413-415. Notably, Johnson had been arrested in Monroe in February 1990 for possession of Schedule II drugs. The officer described John H's club as "a pretty rough place" where fights and disturbances were frequent.
Regardless of whether Davis did or did not draw a gun, it is undisputed that Johnson's shots missed Davis. Instead, two of the bullets struck another bar patron, Inez Smith, who later died of her wounds. All of the persons involved in the encounter fled from the scene before police arrived. Paul Jasper and David Davis left together. R.pp. 243-244; 266.
Johnson fled the state and headed for California but was captured by police and sheriff's deputies in Las Cruces, New Mexico. Officers there took Johnson's statement regarding these events; Johnson asserted essentially the same self defense claim he advanced at trial.[2]
As noted, the jury found Johnson guilty as charged of second degree murder. Trial counsel filed a motion for appeal but apparently allowed the delays to run without taking further action; the appeal was dismissed. However, Johnson sought post conviction relief and obtained an out-of-time appeal in which he is represented by the Louisiana Appellate Project.

*1054 Discussion: Sufficiency of Evidence

By his third assignment Johnson urges the verdict of guilty was contrary to the law and evidence presented at trial; specifically he urges the record mandates a finding of self defense and verdict of not guilty. The question of legal sufficiency is ordinarily raised by a motion for a post verdict judgment of acquittal under La.C.Cr.P. art. 821. Although Johnson's trial counsel filed no such motion, the issue is presented by assignment of error and we will consider it. State v. Green, 28,994 (La.App.2d Cir. 2/26/97), 691 So.2d 1273.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard of appellate review for sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. State v. Bellamy, 599 So.2d 326 (La.App. 2d Cir.), writ denied 605 So.2d 1089 (1992).
This court's authority to review questions of fact in a criminal case is limited to the sufficiency evaluation under Jackson v. Virginia, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 5(C); State v. Williams, 448 So.2d 753 (La.App. 2d Cir. 1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Rogers, 494 So.2d 1251 (La. App. 2d Cir.1986), writ denied 499 So.2d 83 (1987).
Johnson argues that his conviction should be reversed because according to both himself and one of his cohorts, Terry Davis, the intended victim (David Davis) was wielding a handgun and Johnson fired only in self defense. He also urges that Officer Matthews proved that David Davis had a reputation as a drug dealer who carried a firearm.
This recitation of the testimony favorable to the defense is correct as far as it goes, but Johnson neither mentions the State's evidence that the intended victim was not armed, nor explains why the jury was wrong to accept that testimony. All the other witnesses stated that David Davis was unarmed, and this is at least partially corroborated by the fact that Davis did not return fire, no weapon was ever recovered from Davis, and bullets recovered from the victim's body were consistent with a .22 which Johnson admitted to using.[3] Moreover, according to Officer Matthews, none of the witnesses to this encounter had the reputation of an upstanding citizen. The jury obviously chose to credit the testimony of the witnesses who observed no weapon on the intended victim.
There is nothing in the record or the argument which would warrant reversing the jury's credibility findings; this assignment is without merit.

Transferred intent
By his first two assignments Johnson challenges the State's use of the doctrine of transferred intent to prove an element of the crime.[4] He urges that if his conduct was not self defense, then the evidence shows no specific intent to kill or inflict great bodily harm upon Inez Smith, the unintended victim. He asserts that at most, the State could have charged him with the negligent homicide of Inez Smith and attempted second degree murder of David Davis, the intended victim.
Johnson is correct in asserting that the record shows no specific intent to kill or inflict great bodily harm upon Inez Smith; the case rests entirely on the theory of transferred intent. Over defense objection, the District Court charged the jury with respect to that doctrine:
When a person shoots at another person with a specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon a third person, *1055 if the killing or inflicting of great bodily harm would have been unlawful against the first person, then it would be unlawful against the third person, even though it would be accidental. In other words, if the State has proven beyond a reasonable doubt that the defendant had the specific intent to kill one person or to inflict great bodily harm upon that person, but accidentally killed or inflicted great bodily harm upon another person, you must transfer that intent from the intended victim to the actual victim.
R.p. 112.
The State urges that this instruction is correct, as was the Court's refusal to grant the motion to quash, on the basis of early jurisprudence embracing the doctrine of transferred intent. In State v. Salter, 48 La. Ann. 197, 19 So. 265 (1895), the court reproduced the defendant's contention:
"To present the exact question, we suggest the entire question turns on whether, `in a case where an intention exists to do some specific act, and, in attempting to do the specific act, an entirely different and distinct and unintended injury is inflicted on another person, can the prosecution make one lumping charge, and join the intention to the unintended act and make one compound crime?'"
48 La.Ann. at 200-201, 19 So. at 266.
The Court cited Wharton's Criminal Law & Practice and considered the proof necessary for murder, and concluded:
Counsel's proposition, substantially, was that, if Salter in illegally and feloniously shooting at Thomas Antony, with the intent to kill or murder him, failed to accomplish his purpose, but did shoot and kill Mark Antony unintentionally, his will having been directed exclusively to the particular end he had in view, of killing or murdering Thomas Antony, the only crime for which he could be indicted, so far as Mark Antony was concerned, was for shooting at Thomas Antony, with intent to kill or murder him, so negligently as to shoot and kill Mark Antony accidentally. Such a proposition as that is totally untenable. * * * The fact that the accused may not have had reason to expect that his shot would strike a third person would not make any difference in the legal situation.
48 La.Ann. at 204, 19 So. at 267.
In State v. Thomas, 127 La. 576, 53 So. 868 (1910), the court addressed the issue even more directly. There the defendant quarreled with one Washington in front of the latter's house, walked about 200 yards away, and procured a gun, and returned and, without excuse, fired at Washington, wounding both him and one Alma Meyers, who was on the gallery of the house behind him. He was charged under a statute (apparently attempted murder) which provided:
Whoever shall shoot, stab, cut, strike, or thrust any person with a dangerous weapon with intent to commit murder, under any other circumstances than those mentioned in the preceding section, shall, on conviction, suffer imprisonment at hard labor or otherwise for not less than one nor more than twenty one years.
The court held:
We agree with the learned trial judge that in the instant case the terms of the statute are completely satisfied, and the allegations of the indictment fully proved, if there is the shooting of any person,no matter of what person,and the shooting is done with a dangerous weapon and with intent to commit murder; in other words, that there is nothing in the terms of the statute requiring that the person who was shot should have been the person intended in fact to be murdered, or who was shot at. 127 La. at 577-578, 53 So. at 869 (emphasis added).
The court contrasted Louisiana's statute with one from Arkansas which defined murder as "shoot[ing] at * * * another * * * with intent to kill * * * such person[.]" The "such person" proviso made the Arkansas statute substantively different from our own by requiring the actor's evil intent to be directed toward the victim of the violence.
More recently, this court has approved the doctrine of transferred intent, with little discussion, in State v. Jasper, 28,187 (La.App.2d Cir. 6/26/96), 677 So.2d 553, and in State v. *1056 Cannon, 26,906 (La.App.2d Cir. 6/21/95), 658 So.2d 728.[5]
Johnson concedes that the early opinions of State v. Salter and State v. Thomas, supra, did indeed apply a theory of transferred intent. He contends, however, that those cases are inapposite because of numerous changes in the State's homicide laws since the turn of the century. He specifically argues that at the time of those decisions, criminal homicides fell into only two categoriesmurder and manslaughterand the crime of negligent homicide did not exist (a form of vehicular involuntary homicide was enacted by La. Acts 1930, No. 64, and the modern negligent homicide statute enacted by La. Acts 1942, No. 43). Tracing the historical development of Louisiana's homicide statutes, he contends in essence that the creation of the crime of negligent homicide negated the purpose for the transferred intent doctrine, and that it should no longer be preserved in the law. He does not specifically contend that application of the doctrine would deprive him of due process or that its absence from the text of the criminal code annuls its validity.
The provisions of the Criminal Code cannot be extended by analogy to create crimes not provided for therein; however, the Code's provisions "shall be given a genuine construction, according to the fair import of their words, taken in their usual sense, in connection with the context, and with reference to the purpose of the provision." La. R.S. 14:3. We therefore approach the applicable statutes by giving them a plain reading.
Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." R.S. 14:10(1). Although the Code does not mention transfer of intent, it defines criminal consequences as "any set of consequences prescribed in the various articles of this Code * * * as necessary to constitute any of the various crimes defined therein." R.S. 14:9.
Johnson was charged with second degree murder, R.S. 14:30.1. This statute provides, in pertinent part:
Second degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm. * * *
The statute requires the State to prove only that the offender had a specific intent to kill or inflict great bodily harm; stated otherwise, the State must prove that the defendant intended the criminal consequence of the death or serious injury of a human being. The State must prove a causal link between the defendant's criminal conduct and the criminal consequence, but the statute does not appear to require a connection between the subject (victim) of the defendant's intent and the criminal consequence. To read into the statute the additional element of proving that the defendant intended the death of the person who actually died, would be a strained and unjustified interpretation.
Although further analysis is not really necessary, we would note that the purpose of the statute is apparently to prevent the intentional killing of human beings. See, e.g., Rault, "On Louisiana's New Homicide Statutes: Purpose, Constitutionality and Problems of Interpretation," 19 Loy. L.Rev. 563, 574 (1973). The statute accomplishes this purpose without requiring the State to prove that the defendant specifically intended the death of the person who was actually killed. We also note that neither at the time of the enactment of the Criminal Code, nor in any of the subsequent amendments, has the legislature included provisions that would overrule the rationale of State v. Thomas, supra.
Johnson finally argues that despite the plain meaning of the statute, his conduct could or should give rise only to dual charges of attempted murder and negligent homicide. In view of our conclusion that R.S. 14:30.1 permits the application of doctrine of transferred intent, we find it unnecessary to answer Johnson's suggestion of appropriate charges. We would only note parenthetically that under certain circumstances a charge of negligent homicide may arise from the negligent *1057 handling of a firearm that results in death. See La. R.S. 14:32, Reporter's Comment; State v. Barberousse, 458 So.2d 569 (La.App. 3d Cir.1984), aff'd 480 So.2d 273 (1985); State v. Douget, 507 So.2d 283 (La. App. 3d Cir.1987). Usually, however, the act of drawing a loaded gun, pointing it at a person or a crowd, and firing, will prove intent to kill or inflict great bodily harm. State v. Vergo, 594 So.2d 1360 (La.App. 2d Cir.), writ denied 598 So.2d 373 (1992); State v. Guy, 95-0899 (La.App. 4th Cir. 1/31/96), 669 So.2d 517, writ denied 96-0388 (La.9/13/96), 679 So.2d 102. If the State chose to bring dual charges of attempted murder and negligent homicide against a defendant whose conduct was similar to Johnson's, then the State would face the practical dilemma of proving both that the defendant had the specific intent to kill the intended victim, but had no specific or general intent to kill or inflict great bodily harm upon the actual victim. We decline Johnson's invitation to rule on the outcome of such a procedure.
For all these reasons, Johnson's first two assignments of error are without merit.

Conclusion
Johnson's sufficiency argument is without merit because it is grounded in a reasonable credibility call made by the jury. The transferred intent argument is likewise without merit, based on the plain reading of the statute. To exclude the concept of transferred intent would, in this case at least, essentially reward the defendant for his poor marksmanshipan unacceptable result. The conviction and sentence are therefore affirmed.
AFFIRMED.
NOTES
[1] James Johnson did not report the attack to police until August 1991. R.p. 429.
[2] The transcript of the statement appears at R.pp. 67-79.
[3] In his recorded statement to the sheriff's investigator in Las Cruces, Johnson said he disposed of the gun "way in the woods" near Calhoun. R.p. 74.
[4] By his first assignment he urges the District Court erred in allowing the State to use transferred intent as an element of the crime of second degree murder; by his second, he urges the court erred in failing to sustain his motion to quash, which advanced the same argument.
[5] These cases utilized a jury charge identical to the one given in the instant case.