998 So.2d 877 (2008)
STATE of Louisiana, Appellee
v.
Cordell SHIVERS, Appellant.
No. 43,731-KA.
Court of Appeal of Louisiana, Second Circuit.
December 3, 2008.
*878 Louisiana Appellate Project by Edward K. Bauman, Lake Charles, for Appellant.
Paul J. Carmouche, District Attorney, Catherine M. Estopinal, William Jacob Edwards, Sarah S. Midboe, Assistant District Attorneys, for Appellee.
Before DREW, MOORE and LOLLEY, JJ.
MOORE, J.
Following a bench trial, the defendant, Cordell Shivers, was convicted for the second degree murder of Glen Egan and attempted second degree murder of Terrance Nash. The trial court sentenced Shivers to a mandatory life sentence without benefit of probation, parole, or suspension of sentence for the murder conviction and 41 years at hard labor without benefits for the attempted murder conviction, both sentences to run concurrently. Defendant filed this appeal. For the following reasons, we affirm the conviction and sentence.

Facts
This case arises from a drive-by shooting that occurred on Harris Street in Shreveport on the evening of January 27, 2006. Glen Egan was outside his home with Terrance Nash, David Howard, and Brent Smith, Jr., aka "Brenty Boy," when a Lincoln Towncar with three men inside came down the street. As the vehicle approached Egan's house, the two passengers in the vehicle opened fire. Egan was killed and Nash was severely wounded.
After a brief investigation, Cordell Shivers was arrested and charged by amended bill of indictment with the second degree murder of Glen Egan and the attempted second degree murder of Terrance Nash. Shivers pled "not guilty" to the charges and waived a jury trial. After trial, the court found Shivers guilty as charged. The trial court denied Shivers' motion for post verdict judgment of acquittal. Subsequently, the trial court imposed a life sentence at hard labor for the murder of Egan and 41 years at hard labor for the attempted murder of Nash, both sentences to be served without benefit of probation, parole or suspension of sentence. Shivers filed this appeal.
The defendant's sole assignment of error is that the evidence at trial is insufficient to sustain his convictions. The linchpin of his argument is that the state's case against him relies entirely on the self-serving testimony of Sherrod Whittie, which Shivers contends is not credible.

Summary of Evidence Adduced at Trial
The following is a summary of the more important evidence presented by the state at trial:
Terrance Nash testified that at 10:30 p.m. on January 27, 2006, he was at Glen Egan's house on Harris Street, which was located across the street and two doors down from his own house. He, David Howard and Brent Smith, Jr., as well as Egan were outside of the front of the house when the shooting occurred. Nash said that he saw the vehicle containing the shooters pass slowly by Egan's house and then returned a second time. The vehicle stopped across the street and the shooting began. Nash was hit, and he saw that Egan was also hit. He saw David Howard pull Egan off the front porch. One of the men called 911.
Nash testified that he saw shots fired from the vehicle. One shooter fired from the back seat on the driver's side (which faced Egan's house); Nash said the shooter *879 had opened the back door and was shooting. The other shooter was firing from the front passenger's side, but he could not tell if he was shooting over the car toward them or in the air because he could only see the fire coming from the weapon. Nash did not see the driver do any shooting. All three occupants of the vehicle were black males, but the driver was bright-skinned. Nash could not identify any of them.
Charmin Nash, the wife of Terrance Nash, testified that she was returning home in her vehicle just before the shooting started. As she pulled into the driveway of their home, she heard shots; she looked back and saw a car pass behind her. She identified a photograph of the Lincoln as the vehicle she saw, and she stated that when the car passed by, she saw a black male on the passenger's side with a gun in his hand. She then went across the street to where her husband, Terrance Nash, had been shot.
Brent Smith Jr.'s testimony corroborated that of Terrance Nash. He identified the vehicle in the shooting as a Lincoln Towncar belonging to John Mitchell. He stated that shots were fired from the back window on the driver's side, and he saw the barrel of a rifle sticking out the window. No shots appeared to be fired from the driver's seat. The vehicle slowed when the shots were fired and then accelerated. Smith called 911 after the shooting. A few minutes before the shooting, he saw a white Chevy pass by.
David Howard also testified regarding how events unfolded. He and Nash were facing Egan's house talking to Egan and Smith when the shooting started. The shots were fired rapidly, and Howard did not turn around but hit the ground. He did not get a good look at the car, but heard it accelerate away.
John Mitchell testified that Sherrod Whittie, whose nickname was "Yellow Boy," was a friend of his. He stated that he also knew James and Cordell Shivers, who were his cousins. Finally, Mitchell said he also knew Smith. He testified that he and Whittie co-owned the Lincoln which they purchased from South Park Auto Sales under the name of Terrance Cook, Sherrod's older brother. Both maintained the car. A week or two before the shooting, the car had broken down in Whittie's yard, so Mitchell told Whittie that he could have the car because it kept breaking down. In mid-afternoon of the day of the shooting, he returned home with his mother and saw the vehicle parked in front of his house. Whittie was there with James Shivers to collect some money from Mitchell for a debt.
Around 10:00 or 11:00 p.m. his mother's boyfriend, Rodney Eason, came to the house to hook up a stove for him. Mitchell was there with his girlfriend, Shameka Carson. About an hour or two after Eason left, his mother came to his room, upset because she had heard that he and Whittie had been shot. Eason and his mother went to Whittie's house on Fairfield to see what had happened.
When he got there, the Lincoln was not there, but Whittie was there with his wife and two other kids. He said Whittie looked "a little shocked." The next day, Mitchell went to the police. He said it was his understanding that James and Cordell Shivers were upset at "Brenty" for breaking into their house. According to Mitchell, Sherrod had asked Mitchell to talk to James and Cordell Shivers about taking it easy regarding "Brenty Boy." He indicated also that, as between the two brothers, Cordell could not be calmed down.
Shameka Carson, Mitchell's girlfriend at the time of the incident, corroborated Mitchell's testimony about ownership of *880 the Lincoln. She had seen Whittie with "Boo Boo" (James Shivers) around 6:30 p.m. on the day of the shooting. That night, Mitchell left with his mother who was upset about a phone call she had received.
John Lorick, owner of South Park Auto Sales, testified that on the day after the shooting, he got a call from Terrance Cook who told him that he could not pay for the vehicle and needed to turn the vehicle in. The vehicle was returned that day. Lorick identified the 1994 Lincoln Towncar that was returned that day and impounded by police as the vehicle he had sold to Terrance Cook.
Sherrod Whittie testified that he knew Cordell Shivers and identified him in the courtroom. Whittie verified that he and Mitchell jointly purchased the Lincoln Towncar in the name of his brother, Terrance Cook. However, Mitchell turned the car over to him after it broke down, which was about two weeks before the shooting. On the day of the shooting, he repaired the Lincoln, and he and James Shivers went to Advanced Auto Parts to purchase a part for James' Chevy Caprice. He and Shivers also went over to John Mitchell's house to drop off some stuff Mitchell had left in the car. Then they went to the home of C.W. Shivers, an uncle of James and Cordell Shivers.
Whittie testified that when it was near dark, while he and James Shivers were still at C.W. Shivers' home working on the white Caprice, Cordell Shivers and Jaravion Johnson came to the house. Whittie then went home, which was just around the corner, to bathe. Cordell and some others walked over to Whittie's house and asked if they could borrow the car. Whittie let them use the car while he took a bath. After Cordell returned with the car, he (Whittie), Shivers, and Johnson went back to C.W. Shivers' house where James Shivers was still working on the Caprice. After fixing the vehicle, James asked Whittie to follow him to his mother's house to drop the car off and then ride back with Whittie. Whittie followed James Shivers with Cordell Shivers and Johnson as his passengers. Johnson was in the passenger's seat and Shivers was behind Whittie. Whittie testified that he did not see a SKS rifle or "chopper" when they left the house, nor did he know how the weapon got into his vehicle.
As he followed behind James Shivers, Whittie came to the street where the incident occurred. Whittie blinked his lights at James Shivers who "was just playing in the road," at which time he heard Cordell say something like "there they go." At this point, the shooting started. Whittie heard the shots coming from behind his head from the person in the back seat, which was Cordell Shivers. Whittie stated that he had not come to a stop and was going about "twenty", with James Shivers still ahead of him. Rather than go to James Shivers' house, he testified that he was scared and drove home. He said that he drove the car behind the house and ran inside to talk to his brother. Ten minutes later he came outside and moved the car to the front. He said he saw Cordell Smith in the front yard. Smith and Johnson left when another car came and picked them up. Whittie denied that he ever saw a rifle or gun.
Whittie turned in the vehicle the next day, but stated he had already intended to turn it in before the shooting occurred. He stated that he did not see Johnson fire a weapon. He admitted that in his grand jury testimony he indicated that he had flashed his lights at James Shivers to get him to stop in order to ask him something, but without explaining the discrepancy. Whittie testified at trial that he was "just messing with him." He also testified that *881 after turning in the car earlier in the day, he went to the police later in the day; this was after his brother had told him that the police wanted to talk to him.
Terrance Cook's testimony corroborated part of Whittie's and Mitchell's testimony. Cook confirmed that Whittie and Mitchell bought the Lincoln in his name and returned the vehicle to South Park the day after the shooting. Cook indicated that on the night of the shooting, he heard shots and his brother, Whittie, later came into the house looking spooked. Mitchell then came by because he had heard that Whittie had been shot, and Whittie admitted that people in his car had done the shooting. The next morning Whittie said that "Doobie" (Cordell Shivers) was one of the shooters; Cook forgot the name of the other person named by Whittie.
Officer Deandre Bell of the Shreveport Police Department testified that he went to the crime scene shortly after the shooting. He found several spent rounds in the street, and found Glen Egan, who had received three gunshot wounds, and Terrance Nash, who was shot in the upper buttocks. Bell spoke to Charmin Nash, who told him that she was driving behind the Lincoln and saw shooting from the vehicle, but she could not give a description of the suspects.
Corporal Terrance Lesane of the Shreveport Police Department testified that he went to the crime scene and found several shell casings. Officer Mike Lasuzzo of the Shreveport Police Department testified that on the day of the shooting at 4:35 p.m. he had gone to the home of Janice Shivers (mother of the Shivers brothers) to investigate a burglary in which some purses, pants, a Playstation, and a radio were taken; no suspects were identified.
Earl Kohlman, a manager of the Advanced Auto Parts store on East 70th Street, testified regarding a receipt dated January 27, 2006, 3:32 p.m. (the receipt found in the Lincoln) referencing a 1988 Chevrolet Caprice with the name of Janice Shivers and her telephone number; the receipt was for brake pads.
Dr. Frank Peretti was qualified as an expert in forensic pathology and testified concerning the autopsy he performed on Glen Egan and the cause of death. Peretti stated that Egan died of multiple gunshot wounds. Bullets were recovered during the autopsy and identified in court.
Shreveport Police Officer Danny Duddy testified as a fingerprint identification expert. He went to the crime scene the night of the shooting. He testified regarding damage to Egan's house and to the trajectory of the bullets being consistent with shots fired from a vehicle on Harris Street. He also testified about 11 shell casings found in the streettwo 9mm casings and the rest were 7.62 x 39 caliber. The 9mm casings were more to the west side of the street, while the others were mostly on the east side of the street. Numerous crime scene photos were introduced. Duddy also went to LSU Health Sciences Center and obtained a fingerprint from Egan's body which was used to identify Egan. He also examined the Lincoln and the auto parts receipt for fingerprints. Duddy testified that a print found on the receipt matched Cordell Shivers' print. A latent fingerprint taken from the Lincoln matched Jaravion Johnson; the print was found on the inside of the front passenger window.
Officer Mike Armstrong of the Shreveport Police Department also testified about his investigation of the crime scene, the shell casings found, the bullet trajectories, and about lifting the latent print from the Lincoln.
*882 Shreveport Police Detective Patrick McConnell testified about the crime scene investigation and how Cordell Shivers was developed as a suspect through Sherrod Whittie. As a result of the investigation, he went to Shivers' residence on Balentine Street. When he arrived with other officers, Cordell Shivers and Nelson Shivers, his cousin, were on the carport. Cordell ran into the house and Nelson ran into the laundry room. Janice Shivers, James Shivers, his girlfriend, Jaravion Johnson, and some children were also at the house. In Cordell Shivers' bedroom were 7.62, .38,.40, .45, and 9mm ammunition. A 9mm pistol and a .38 revolver, along with some marijuana, were found in the laundry room. Shivers was arrested and later stated that the 9mm pistol was his. A Chevrolet Caprice at the residence was not searched due to lack of permission. McConnell said that on January 29, 2006, James Shivers, Nelson Shivers, and Jaravion Johnson came to the police station; Johnson, who was 16, claimed ownership of the gun which he said he found when walking through vacant lots near the scene of the shooting.
McConnell also testified about recordings made of telephone conversations of Cordell Shivers while he was in the Shreveport City Jail. In a conversation between Shivers and Johnson, Shivers asks Johnson if he shot the "nine" and Johnson said that he shot it three times. Shivers stated that he hoped they didn't find the "club", which McConnell surmised was the rifle. McConnell also stated that Shivers asked Johnson to take the charge for him because Johnson was a juvenile who would receive less time than an adult. Joe Roger Smith, a shift commander at the Shreveport City Jail testified about the recording of telephone calls at the jail.
Richard Beighley, the firearms section supervisor at the North Louisiana Crime Lab, was qualified as an expert in the field of firearms identification. Beighley testified regarding items that had been brought to him by Danny Duddy. He stated that the two 9mm shell casings were fired from the 9mm pistol. The nine 7.62 x 39mm cartridge casings were rifle ammunition and were a brand manufactured in Russia, although there were numerous such manufacturers in the United States as well as in other countries. The cartridge casings were the same brand as the 7.62 ammunition from the Shivers' residence. Furthermore, the 9mm cartridges found in the Shivers' residence were the same brand as the two 9mm shell casings.
Finally, Detective Eric Farquhar of the Shreveport Police Department testified corroborating Det. McConnell's testimony. Farquhar, who met with Sherrod Whittie on more than one occasion, referred to Whittie as "bright skinned", meaning his complexion was a yellowish brown.

Discussion
The defendant's claim that the evidence was insufficient to convict is based on his contention that Sherrod Whittie's testimony was uncorroborated and not credible. Whittie tried to hide the Lincoln Towncar after the shooting and then disposed of it the next day. He only turned himself in after his brother, Terrance Cook, told him that the police were looking for him. His testimony that he did not slow down when passing the house was contradicted by Terrance Nash's testimony that the vehicle stopped and then the shooting began. After the Lincoln Towncar used in the drive-by shooting was tracked to him, Whittie admitted to police that he was the driver of the vehicle, but he claimed he had no knowledge that the other two passengers in the vehicle were going to shoot the victims. He named Cordell Shivers as the backseat passenger and later identified Jaravion Johnson from *883 a photo line-up as the front seat passenger. He testified that these two men were the shooters.
Shivers also points out that no one (other than Whittie) could identify the shooters, that the rifle used in the crime was never recovered, and that his fingerprints were not found in the vehicle used in the shooting. He further argues that an auto parts receipt with his fingerprint on it found in the Lincoln did not prove that he was in the vehicle at the time of the shooting, and that there were several individuals at his home when police searched and found 9mm ammunition. In short, defendant claims that there are too many discrepancies and unanswered questions about Whittie, whose testimony forms the basis of the state's case, to find Cordell Shivers guilty beyond a reasonable doubt.
The standard of review for a claim that the evidence at trial was insufficient to convict is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, XXXX-XXXX (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La. App. 2 Cir. 8/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard is now legislatively embodied in La. C. Cr. P. art. 821, which does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, XXXX-XXXX (La.2/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a judge or jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied, XXXX-XXXX (La.11/14/03), 858 So.2d 422; See also, State v. Bowie, 43,374 (La.App. 2 Cir. 9/24/08), 997 So.2d 36, (same deference applies to bench trial). In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App. 2 Cir. 5/9/07), 956 So.2d 769; State v. Burd, 40,480 (La.App. 2 Cir. 1/27/06), 921 So.2d 219, writ denied, XXXX-XXXX (La.11/9/06), 941 So.2d 35.
Second degree murder includes the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm; second degree murder also includes the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of assault by drive-by shooting, even though he has no intent to kill or to inflict great bodily harm. La. R.S. 14:30.1.
Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended, and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose. La. R.S. 14:27(A).
Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Davies, 35,783 (La.App. 2 Cir. 4/05/02), 813 So.2d 1262, writ denied, XXXX-XXXX *884 (La.5/9/03), 843 So.2d 389, citing La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990).
Specific intent to commit a crime is an element of an attempted offense. La. R.S. 14:27. Hence, a conviction of an attempted offense must rest upon sufficient proof that the offender actively desired to cause the proscribed criminal consequences to follow his act or failure to act and that the offender committed or omitted an act for the purpose and tending directly toward the accomplishing of his object. La. R.S. 14:10, 14:27. See State v. Parish, 405 So.2d 1080 (La.1981), on remand, 429 So.2d 442; State v. Cheatham, 38,413 (La.App. 2 Cir. 6/23/04), 877 So.2d 164, writ denied, 2004-2224 (La.6/24/05), 904 So.2d 717. Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. La. R.S. 14:10(1); State v. Draughn, XXXX-XXXX (La.1/17/07), 950 So.2d 583, cert. denied, ___ U.S. ___, 128 S.Ct. 537, 169 L.Ed.2d 377. See also State v. Allen, 41,548 (La.App. 2 Cir. 11/15/06), 942 So.2d 1244.
The trier of fact determines whether the requisite intent is present in a criminal case. State v. Huizar, 414 So.2d 741 (La.1982); State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 So.2d 758. In reviewing the correctness of such a determination under the Jackson standard, the court should review the evidence in the light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, supra; State v. Huizar, supra.
The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Seals, 95-0305 (La.11/25/96), 684 So.2d 368, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997); State v. Dooley, 38,763 (La.App. 2 Cir. 9/22/04), 882 So.2d 731, writ denied, 2004-2645 (La.2/18/05), 896 So.2d 30.
This court has applied the concept of transferred intent when a defendant shoots at one person with the specific intent to kill or cause great bodily harm, but hits and kills someone else. State v. Johnson, 29,629 (La.App. 2 Cir. 9/20/97), 698 So.2d 1051; State v. Jasper, 28,187 (La. App. 2 Cir. 6/26/96), 677 So.2d 553, writ denied, 96-1897 (La.2/21/97), 688 So.2d 521; State v. Cannon, 26,906 (La.App. 2 Cir. 6/21/95), 658 So.2d 728.
Clearly, the most important of the numerous witnesses at trial was Sherrod Whittie, who admitted driving the car, but denied knowing that the shooting was going to take place. He testified that Shivers and Johnson were the shooters. While we agree with the state that although "Whittie was quite likely not the innocent dupe that he claimed to be," other testimony indicated that he was the driver and not one of the shooters. A review of all the evidence shows that while there were some minor inconsistencies, there was nothing directly contradicting Whittie's testimony.
Under the Jackson standard, even if Whittie's testimony was essentially all of the state's case, the trial court could have found it credible enough to convict. However, there was other significant evidence linking Shivers to the crimes. When the police went to Shivers' house, he was standing under the carport near the laundry room and ran into the house. The police found the 9mm pistol in the laundry room, and a search of the house revealed boxes of 9mm and 7.62 rifle rounds of the same brand as shell casings found at the *885 scene of the crime; the rounds were found in a bedroom used by Shivers, and the 9mm casings found at the crime scene were fired from the gun at Shivers' house. Furthermore, telephone calls between Shivers and Jaravion Johnson were recorded at the Shreveport City Jail. Shivers asked Johnson to claim the 9mm and asked if Johnson had fired the 9mm. Johnson responded that he did fire the 9mm and Shivers stated that he hoped they didn't find the "club", which may have been a reference to the rifle. Finally, the evidence revealed a motive for the shooting in that Cordell Shivers and James Shivers were upset because someone had broken into their house and they thought the person was Brent Smith, Jr., aka "Brenty Boy," who was with the victims at the time of the shooting.
After viewing the evidence in the light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt in this case. Accordingly, under the Jackson v. Virginia standard, the evidence in this case was sufficient to sustain the convictions against Cordell Shivers. The convictions and sentences are therefore affirmed.
CONVICTIONS AND SENTENCES AFFIRMED.