# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 24-252


**STATE OF LOUISIANA**

**VERSUS**

**LANCE J. EDWARDS**


\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. CR-2020-0450
HONORABLE JUDI F. ABRUSLEY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## CLAYTON DAVIS
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Jonathan W. Perry, Sharon Darville Wilson, and Clayton Davis, Judges.


**AFFIRMED.**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**600 Jefferson St., #903**
**Lafayette, LA 70501**
**Telephone: (337) 366-8994**
**COUNSEL FOR DEFENDANT APPELLANT:**
    **Lance J. Edwards**

**Hon. Joe Green**
**District Attorney, 33rd Judicial District Court**
**John Richardson**
**Assistant District Attorney**
**105 S. 5th Street**
**P. O. Box 839**
**Oberlin, LA 70655**
**Telephone: (337) 639-2641**
**COUNSEL FOR PLAINTIFF APPELLEE:**
    **State of Louisiana**

**DAVIS, Judge.**

Defendant, Lance J. Edwards, was charged with attempted first degree murder of a police officer, a violation of La.R.S. 14:27 and 14:30, domestic abuse battery in the presence of a minor, a violation of La.R.S. 14:35.3(C), and two counts of aggravated assault with a firearm, violations of La.R.S. 14:37.4. He pled not guilty to all charges. A unanimous jury found him guilty of attempted first degree murder and domestic abuse battery but not guilty of aggravated assault. The trial court sentenced Edwards to imprisonment for thirty years at hard labor without benefit of parole, probation, or suspension of sentence on the attempted murder conviction and to two years at hard labor on the domestic abuse battery conviction. The sentences are to run concurrently.

For reasons set out below we affirm Edwards's convictions for domestic abuse battery in the presence of a minor and attempted first degree murder.

*Facts*

On the morning of November 25, 2019, Edwards placed his two-month-old son face down on the couch in the house he shared with the baby's mother, Crystal Anderson. "You're gonna [sic] smother him," a furious Anderson said, and then accused Defendant of hating her and their child.

After the couch incident, Anderson reported to the Allen Parish Sheriff's Office and said Edwards had made threats directed at her and at law enforcement. In response to those allegations, the APSO obtained an arrest warrant. The SWAT unit was summoned because Anderson's allegations suggested that civilian or law enforcement life could be placed in danger while attempting to serve the warrant.

Part of the unit created a diversionary breach on the side of the house while the other part of the team breached the front door. Officers testified Edwards fired

at them as they entered the home. They returned fire, and Edwards dropped his weapon and got on the floor. He was handcuffed and transported to the APSO without further incident. The SWAT team found several guns and a considerable amount of ammunition in the house after the incident. Edwards consistently maintained he never fired a shot at Anderson or at the officers.

## ASSIGNMENT OF ERROR

Edwards's sole assignment of error claims the evidence at trial was insufficient to convict him.

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371).

*Domestic Abuse Battery*

The jury convicted Edwards of domestic abuse battery with child endangerment, a violation of La.R.S. 14:35.3(C) and (I). That statute provides, in pertinent part:[1]

---

[1]The sentence provided by Subparagraph (C) was not imposed in the trial court, so it is not pertinent to this discussion. Although the failure to impose the Subparagraph (C) sentence provided by Subparagraph (C) results in an illegally lenient sentence, that issue was not raised in an assignment of error and will not be considered by this court. *State v. Jacobs*, 08-1068 (La.App. 3 Cir. 3/4/09), 6 So.3d 315, *writ denied*, 09-755 (La. 12/18/09), 23 So.3d 931.

A. Domestic abuse battery is the intentional use of force or violence committed by one household member or family member upon the person of another household member or family member.

. . . .

I. This Subsection shall be cited as the "Domestic Abuse Child Endangerment Law." Notwithstanding any provision of law to the contrary, when the state proves, in addition to the elements of the crime as set forth in Subsection A of this Section, that a minor child thirteen years of age or younger was present at the residence or any other scene at the time of the commission of the offense, the offender, in addition to any other penalties imposed pursuant to this Section, shall be imprisoned at hard labor for not more than three years.

On November 25, 2019, the APSO received a dispatch advising of a situation in Elton that had started in Allen Parish and involved a firearm and threats made to law enforcement. APSO was advised that Anderson was coming to talk to him.

In her statement written during that meeting, the first thing Anderson recalled after getting up the morning of the incident was "going off" on Edwards. She had asked Edwards to watch the baby, and she "felt threatened" by the way he took the baby and laid him on his stomach on the sofa. Anderson became furious and told Edwards, "You're gonna [sic] smother him." The argument quickly escalated, and Anderson accused Edwards of hating her and the baby.

As Anderson and Edwards argued, he had something long and black in one hand, and Anderson thought it was a gun. He may have even had two guns in his hands. He pointed a gun at Anderson and the child, and she heard a noise. Anderson thought Edwards had shot her. She thought the noise "could of [sic] been anything." She was in a rage, and "had done tore up [sic] the house." Edwards was "walking back and forth" when he passed her; she turned her head "for a second and [she] heard boom." "I started screaming oh you shot at me,"

3

Anderson testified. "And he was like what are you talking about . . . . I'm like oh you did it, but in [my] mind it just kept building up you did it, you did it. No, and only from a sound I mean I don't even know if it's actually a gun he had in his hand." She also told them about the fight that came afterwards.

Anderson said Edwards forcefully grabbed her arm, even though she denied that the fight was physical. An officer observed light bruising on Anderson's upper arm and photographed the area. Those photographs were admitted into evidence at trial. The officer feared Anderson was in imminent danger of harm based on her verbal and written statements.

Anderson followed up by filing a protective order which was heard on December 6, 2019. At the hearing, Anderson again testified Edwards pointed a gun at her, and it was so close she could "push the barrel back." She said Edwards told her he would shoot up her family, and he would shoot law enforcement if they were there.

At trial, Anderson testified she was not sure whether Edwards was holding a gun. She also said that whatever he was holding, he never pointed it at her and the child. As to the fight, Anderson testified "[i]t wasn't really [a] physical fight." Indeed, Anderson testified she "may have pushed him," and if he did grab her, it was "most likely to calm [her] down." Edwards had nothing in his hands at that point. He did not touch her "in a bad way . . . he was just trying to calm [her] down." He had nothing in his hands. He would have had to touch her to calm her.

Edwards testified similarly about the argument. He went outside and called Anderson's mother, Cotaridie Jones, because he thought Anderson needed help. He told Jones that Anderson "was tripping or whatever." He described the situation as "chaotic." Edwards sat on the couch as Anderson carried her and the baby's

4

belongings to Jones's car because he did not want "any more interference with her." Edwards denied shooting at her.

Jones arrived soon thereafter and took Anderson and the baby to her home in Elton. Later in the day, Edwards went to Jones's home from Kinder on a four-wheeler. He was armed with a 9mm pistol and a shotgun.

During his visit to Elton, Edwards told Anderson that if she called law enforcement, "blood will be shed," and "it [was] going to get bloody." He then returned to his home in Kinder.

Jones testified she went to Kinder and took Anderson to Elton after Edwards called her and said Anderson "needed to cool off." When Jones walked into the house, Anderson was holding the baby, and Edwards was sitting on the couch. Anderson was upset with "tears coming down" and said they had been in an argument, but she said nothing about the substance of it. Jones saw no markings on Anderson, and Anderson did not say Edwards had hit her or shot at her. Anderson did not show her a bullet hole in the wall, and she did not see one. She saw no bullet casings in the house. Jones knew of nothing to make her believe Edwards shot at her daughter and grandson.

Edwards was unaware of Anderson's allegation that he had shot at her when he went to Elton. He later learned of that from law enforcement after his arrest. He testified he kissed Anderson and the baby when he left Elton and returned home. He looked for some of his guns that were missing and thought Anderson must have hidden them when he went outside and called her mother.

The APSO was advised of the domestic incident and learned that the Elton Police Department had seen Edwards on a four-wheeler in the Elton area. Officers asked for and obtained a warrant for Edwards's arrest. They also pursued charges

5

for domestic abuse battery by child endangerment and two counts of aggravated assault with a firearm based on Anderson's report that Edwards fired at her and the baby.

Although Anderson filed for a protective order against Edwards on the day after their argument, she testified at trial that she did not want it once she understood what it was. She testified she was "just doing what this person [the district attorney's office] say [sic]" and that she "didn't know what it was." She really "wanted like a stay away or restraining order" because of what she thought at the time had happened that day. At trial, she denied making the check marks on the form for the protective order that indicated Edwards had punched, choked, and stalked her. Anderson ultimately concluded she made a mistake in seeking the protective order because she did not know whether Edwards had really assaulted her.

Anderson told police one thing on the day of the incident, and she repeated those things at the hearing for the protective order. At trial, she said could not recall what really happened, and she did not know if what she reported to the Sheriff's Office in her statement really took place.

The jury accepted Anderson's testimony of what she said at the December 6, 2019, hearing and what she told law enforcement on the day of the incident. The resolution of conflicting trial testimony requires a jury to determine witness credibility. This "is a matter of weight of the evidence and not sufficiency." *State v. Green*, 96-208 (La. App. 3 Cir. 11/6/96), 683 So. 2d 1292, 1297, *writ denied*, 96-2892 (La. 6/13/97), 695 So. 2d 963. The jury may accept or reject the testimony of any witness in whole or in part.

6

"This court's authority to review questions of fact . . . does not extend to credibility determinations" of the jury. *State v. Johnson*, 29, 629, p. 5 (La. App. 2 Cir. 8/20/97), 698 So. 2d 1051, 1054. This court will not disturb the jury's verdict when it is supported by the testimony of a witness, whether in whole or in part. This assignment of error lacks merit.

<u>Attempted First Degree Murder</u>

The jury also convicted Edwards of attempted first degree murder, a violation of La.R.S. 14:30. That statute states, in pertinent part:

A. First degree murder is the killing of a human being:

. . . .

(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman, peace officer, or civilian employee of the Louisiana State Police Crime Laboratory or any other forensic laboratory engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict great bodily harm is directly related to the victim's status as a fireman, peace officer, or civilian employee.

An attempt is statutorily defined as "having a specific intent to commit a crime," and doing or omitting "an act for the purpose of and tending directly toward the accomplishing" of the intended offense. La.R.S. 14:27. "Specific intent to kill may be inferred from a defendant's act of pointing a gun and firing at a person." *State v. Hoffman*, 98-3118, p. 48 (La. 4/11/00), 768 So. 2d 542, 585, *cert. denied*, 531 U.S. 946, 121 S.Ct. 345 (2000). Thus, to find Edwards guilty of attempted first degree murder, the jury had to find he specifically intended to kill the officers who carried out the arrest warrant.

Based on Anderson's complaint, the APSO obtained a warrant to arrest Edwards for domestic abuse battery. Because Anderson indicated Edwards was armed and had made threats against her and law enforcement, APSO made the

7

determination to activate the SWAT team. The team used a layout of the house sketched by Anderson to formulate its entry plan.

When the team arrived at the residence, it approached through a small patch of woods east of the residence to remain obscured from view from the house. The area from the woods to the house was well-lit, and the team was exposed and unprotected for a brief moment. The team then split, with part of the group going to the southeast corner of the house to create a diversionary breach, and the others going to the northwest corner to approach the front door. APSO Lieutenant Commander Drew Gushlaw saw the light of a surveillance camera on the porch and believed they were being watched, so they "need[ed] to pick up a bit."

The diversionary group heard a command to "execute" and broke the bathroom window on the side of the house. At the same time, the rest of the team announced its entry, and APSO Deputy Jose Ortiz heard gunfire at the diversionary site.

The team had "stacked up" at the front door, with APSO Deputy Tyler LaCaze at the front holding a twenty-pound sledgehammer to breach the door. APSO Deputy Jeffrey Strahan followed, holding a ballistic shield to protect the team from gunfire. Next came Detective Dustin Doyle, Deputy Joshua Manuel, Lieutenant Commander Gushlaw, and Deputy Larry Amos. As the diversionary team broke the window, Deputy Manuel at the front door shouted, "Sheriff's Office Search Warrant." Deputy LaCaze breached the door with one blow and fell into and to the right of the door onto his knee. He did not see anyone inside, but as he moved the sledgehammer out of the way, he heard someone announce "gun, gun, gun" and then "maybe three gunshots." He could not determine who was shooting or from where the shots came. By the time Deputy LaCaze went into the

8

house, Edwards was on the ground with most of the team crowded around him. Deputy LaCaze saw weapons throughout the house.

Deputy Strahan entered the doorway after Deputy LaCaze. He moved to his left to clear the threshold for the rest of the team and heard a shot. He saw Edwards standing behind the bar, holding a weapon that looked like a rifle, pointed directly at him. He felt a blast from a shot on his face, on top of his head, and on his pants. Deputy Strahan had been fired at before, and he knew how such a blast felt.

When Deputy Strahan stepped left on the linoleum floor, his foot slid, and he fell three to four feet left of the threshold. He heard officers returning fire, maybe two or three very quick shots. At trial, Deputy Strahan testified he knew Edwards fired first because he saw him fire the gun, felt the blast and concussion coming from the barrel, and then felt the blasts of the shots fired by his team.

Detective Doyle entered the doorway next and saw Edwards holding a rifle. He also saw a light, either a flashlight on the rifle or possibly a flash from the rifle muzzle. Detective Doyle announced, "gun, gun, gun" to those behind him who had not yet seen the armed Edwards inside the house. He heard two or three shots at the same time.

Detective Doyle heard "the whiff of a round" pass his ear, and he felt the wave of the concussion caused by the firing of the round. He fired four to six shots, and Edwards either tossed the gun in the air or dropped it. Edwards took cover behind the bar area in the kitchen, and the team moved closer.

Officers rounded the corner and found Edwards with his hands up and a holster holding an AR-15 pistol on his hip. Edwards made no movement toward the weapon. Officers removed the pistol, handcuffed Edwards, and transported him

from the scene without further incident. Edwards asked Detective Doyle why they shot at him.

Detective Doyle explained how rounds coming out of a gun barrel toward him sound different from those moving away from him. He testified Edwards became a lethal threat when he fired the shot. Officers in return used lethal force until he was no longer a threat. Multiple firearms were found all around the house.

Deputy Manuel saw Edwards crouched at the far end of the house in front of the television with a rifle at his hip pointed in their direction. He heard gunfire, and he felt the air move in his direction from Edwards. Deputy Manuel heard the crack of the round going over his head or somewhere nearby. He testified about feeling the pressure and shock wave caused by rounds of a firearm discharged nearby.

Deputy Manuel testified Edwards "hesitated for a second and then had a very distinct change of the look on his face" after he fired the round. Edwards then "threw his weapon to the side and just dove to the ground" as Deputy Manuel heard the first SWAT team shots shortly afterward. He thought Edwards was taking cover when he went to the ground.

Deputy Manuel recalled Detective Doyle rapidly firing his .223 (AR-15) rifle five times for sure, but he felt certain he heard more shots. Deputy Manuel saw Edwards lying on the floor with no weapon in his hand. Deputy Manuel secured Edwards in handcuffs while Detective Doyle maintained lethal cover. In addition to the pistol on Edwards's hip, Deputy Manuel saw a KelTec KSGH12 on the counter and another rifle on the couch.

Officers considered Edwards a lethal threat because he shot at the SWAT team. The team responded with lethal force until Edwards was no longer a threat. The investigative report of the incident said a bullet hit the door frame, and a bullet

10

hole was later found above the frame. Lieutenant Commander Gushlaw could not say whether the hole was created by the shot Edwards fired or whether that shot went out the door.

Lieutenant Commander Gushlaw told the APSO investigator that he did not see Edwards with a gun. However, he was confident Edwards fired a shot at them because he heard a sound different from that made by an AR-15 that the SWAT team carried. That shot came from within the house, and Edwards was the only person inside. After the team handcuffed Edwards, he asked why they were there.

APSO's Detective Matthew Hebert found spent .223 caliber ammunition rounds from SWAT team weapons on the floor of the house. He testified that another round struck the front door frame as the team entered the house and left a hole in the frame. However, he then stated he did not know when the hole was made. He found no exit mark.

Edwards was a gunsmith, gun trader and all-around gun enthusiast who had amassed an impressive collection of firearms. Among the collection was a customized KelTec twelve-gauge shotgun that Edwards used for home defense, a 9mm Smith and Wesson pistol he used as his sidearm, and the SKS rifle that officers testified he used against them.

Detective Hebert seized that SKS rifle and found it "locked back with a round which appeared to be 'stove piped' [sic] and more rounds in the magazine." He explained that stovepiped referred to "when the round goes to the chamber, but it's locked forward, so it didn't properly chamber." In other words, the rifle jammed, leaving the round standing up. Detective Hebert noted the rear of the jammed round showed a primer strike, indicating it had been struck by the firing pin but failed to fire. Detective Hebert found one spent SKS casing, all that

11

remains after a bullet is fired, on the floor within two feet of where Edwards was subdued. Detective Hebert cleared the SKS rifle of the stovepiped round without taking photographs or making any other type of documentation of the round's placement or condition in the rifle. He made no mention of this round in his investigatory report of the incident.

Edwards took the stand in his defense at trial. He testified he sometimes "re-cased" his bullets by loading gunpowder into a spent round. He purchased the projectiles in bulk at gun shows. The spent rounds were "tapped in the back," meaning "the fire pin hit the primer." Those reloaded rounds would look as if they had already been fired, and they had in fact already been fired before Edwards repurposed them.

In his interview with APSO Detective Leger the night of the incident, Edwards stated 93 times (according to his counsel who said he had counted) that he did not shoot at the officers. He was adamant during that interview about having his KelTec shotgun, not the SKS rifle, in his hand when the SWAT team entered, and he said he was probably on his way to put that shotgun beside his bed where he normally kept it. At trial, however, he said the shotgun was on the counter far away from him.

Edwards also insisted he was standing, not crouching as officers had described, when the SWAT team entered the house. He consistently maintained that he had no idea why the officers shot at him. He did, however, admit he had told Anderson if she was going to "call the cops on [him] for any little thing . . . blood is gonna [sic] be shed[.]" Edwards said "the cops" would "end up wanting to kill [him]." He testified he meant his blood would be what was shed – the blood of a black man in the context of the year 2019. Detective Leger did not perform any

gunshot residue testing on Edwards. He testified he held officers' word and statements in higher regard than those of Edwards because Edwards lied in his interview.

Edwards remembered the date of the incident "[b]ecause that night someone bust [sic] in my house and shot at me." He had slept on the couch the previous night and had an argument with Anderson that morning because he failed to do something the way she wanted it. Their resulting argument got out of hand, and he called Jones to come get Anderson. Edwards had never been in trouble before or been arrested.

Edwards testified he was watching "The Voice" on television as he took an inventory of his guns and ammunition that evening. He said Anderson had trashed the house and either hidden or taken his guns earlier that day while he walked around a two-and-a-half-acre pond and called Jones. Edwards testified he found some of the guns in the sofa and under the bed. He had just gotten up to put one of his guns in his safe when he was distracted by the SWAT breaches. The gun was in his hand. He was standing, not crouching and ready to fire, when the SWAT officers entered the house.

Edwards said he was not aware of the allegations Anderson had made against him earlier that day. He had no reason to suspect officers might be coming to his house. He testified he had not fired any shots at Anderson or at the baby that morning, and Anderson herself testified she was hallucinating when she thought he did fire at them. He was simply taking an inventory of and/or cleaning his guns and happened to have one of them in his hand when officers crashed into his home. As soon as they came in the door, he saw "a shield with sheriff on it" and dropped to the ground.

13

Here, the jury was presented with conflicting testimony of whether Edwards fired at SWAT officers or whether the officers fired first. In his appellant brief, Edwards contends the commotion of the primary and diversionary breaches, along with the announcement of "Sheriff" and the blaring television, would have activated his instinct for self-preservation and caused him to raise his weapon. However, Edwards never raised the issue of self-defense or presented testimony or evidence at trial of self-defense. Rather, he testified that his policy was to not point a gun at anyone and to treat a gun with respect, as if it were loaded. The jury heard evidence of the breaches, the announcements, and the shooting and found Edwards guilty of attempted first degree murder.

Although the State contended a bullet from the SKS rifle lodged in the frame above the front door, the purported bullet was never recovered. Testimony did not indicate any effort was made to extract a bullet from the door frame even though it showed no exit mark. Likewise, testimony did not show whether the bullet was still there. Had a bullet been extracted, testing could have established its caliber, determined the type of gun from which it was fired, and perhaps identified the specific gun that fired it. That was not done. No one could verify that the hole was made by a bullet fired during the argument with Anderson that morning or during the SWAT arrest. In fact, Deputy Strahan testified the bullet Edwards fired may have gone out the open front door, and Lieutenant Commander Gushlaw could not say whether it did. Likewise, the State offered no firearm expert testimony pertaining to the SKS rifle or to the alleged "stove piped" shell.

On the other hand, investigating officers found multiple live rounds in the SKS rifle Edwards held when the SWAT team entered the door. The only reason they could not have been fired was the "stove piped" shell that jammed further

14

shots. The presence of those live rounds was inconsistent with Edwards's testimony that he was simply cleaning or taking inventory of his guns and that he always treated guns with respect, as if they were loaded. The State relied on the primer mark on the casing of the "stove piped" shell to show Edwards had fired it that night. However, had the "stove piped" round been one of Edwards's repurposed casings, it would have already shown a primer strike regardless of whether it had been fired during his encounter with the SWAT team.

Nevertheless, this SKS rifle was loaded. All the officers who heard the shot testified they could, from their own personal experiences, distinguish the sound of its caliber of ammunition from the caliber used in their own weapons. Further, they were familiar with the distinct sounds of bullets fired toward and away from them and the differences between those sounds.

Additionally, the jury heard Edwards's admission that he and Anderson had talked about blood being shed. The jury could have reasonably interpreted that his comments indicated he expected and was prepared for a confrontation with law enforcement.

The record contained no helpful photo of the rifle with the "stove piped" round. The photo which was intended to show the primer strike on the "stove piped" round was too blurred to verify. Moreover, no ballistic analysis was carried out regarding the bullet hole found in the door frame. Consequently, to determine what happened on November 25, 2019, the jury had to rely primarily on the testimony of the detectives and the SWAT officers involved, as well as the contradictory testimony of Anderson and Defendant. The jury heard the officers testify that they felt a shock wave and heard the distinctive crack of a rifle and also heard Edwards testify that there was no shock wave or rifle crack because he was

15

in fact putting his KelTec shotgun in his safe. However, Edwards had testified the shotgun was for home defense and was kept near his bed. Ultimately, the jury gave more weight to the testimony of the officers, and it could infer Edwards' specific intent to kill based on his firing at them with a loaded gun. *Hoffman*, 768 So. 2d 542.

The opposing testimony of Edwards and the SWAT team officers establishes a basis on which rational triers of fact could disagree about the interpretation of the evidence. The jury considered all this evidence, weighed the testimony of Edwards and the SWAT team officers, and by finding Edwards guilty, demonstrated it found the testimony of the State's witnesses to be more credible than Edwards's testimony. We find no manifest error on the jury's part, and we will not disturb its determination of the witnesses' credibility. *See Green*, 683 So. 2d 1292, and *Johnson*, 698 So. 2d 1051.

## CONCLUSION

Anderson's testimony at trial was sufficient to establish the claims she reported to law enforcement even though at trial she could not be certain of what happened that morning. The jury had the opportunity to assess Anderson's credibility, and we will not disturb that finding.

The jury also weighed conflicting evidence about the SWAT team's encounter at the home later that day and found Edwards pointed a loaded gun at the officers and/or fired at them. Such an act constitutes an attempt to kill.

Accordingly, we affirm Edwards's convictions for domestic abuse battery and for attempted first degree murder of the SWAT team officers.

**AFFIRMED.**