STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

10-1253


STATE OF LOUISIANA

VERSUS

BROCK ANTHONY LAFITTE


**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 289,655
HONORABLE THOMAS MARTIN YEAGER, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and John D. Saunders, Judges.

**AFFIRMED.**

Eugene Paul Cicardo
Attorney at Law
P. O. Box 1128
Alexandria,, LA 71309
(318) 445-2097
Counsel for Defendant/Appellant:
Brock Anthony Lafitte


James C. Downs
District Attorney - 9th JDC
701 Murray Street
Alexandria, LA 71301
(318) 473-6650
Counsel for Appellee:
State of Louisiana

**Gregory Norman Wampler**
**Lemoine & Wampler**
**607 Main St.**
**Pineville, LA 71360**
**(318) 473-4220**
**Counsel for Defendant/Appellant:**
**Brock Anthony Lafitte**

**SAUNDERS, Judge.**

On January 10, 2008, the State charged both Defendant, Brock Anthony Lafitte, and Darien James Greenwood with one count of armed robbery, in violation of La.R.S. 14:64, and one count of aggravated second degree battery, in violation of La.R.S. 14:34.7.  On July 13, 2009, Defendant waived his right to a jury trial and moved for a bench trial.  At the conclusion of Defendant's trial, the district court found Defendant guilty as charged.  On February 5, 2010, the court ordered Defendant to serve ten years at hard labor for each conviction; designated that the armed robbery sentence was to be served without probation, parole, or suspension of sentence; set forth that the penalties were to run concurrently; and gave Defendant credit for time served.

Defendant now appeals.  We affirm.

**STATEMENT OF FACTS:**

At trial, Thomas Cass first testified for the State.  Mr. Cass was deer hunting with his son in the Kisatchie National Forest around dawn on October 20, 2007, when he encountered Josh Pilcher, the victim.  Mr. Cass observed that Mr. Pilcher seemingly had been severely beaten, as he was covered in dried blood and mud.  Mr. Cass gave Mr. Pilcher a ride in his truck to seek medical attention.

Mr. Cass related what Mr. Pilcher told him about what happened.  On the prior Thursday evening, Mr. Pilcher loaned his cell phone to two men, but they did not return it.  After calling the number all day Friday, he finally spoke to them.  The two men arranged to meet with Mr. Pilcher near where Mr. Cass went hunting.  When Mr. Pilcher arrived, the two men jumped him, beat him, stole his wallet and keys, and placed him in the back of the truck.  The men took turns driving and beating the man.  After driving for a period of time, they pulled over and threw him into a ditch and

commenced shooting in Mr. Pilcher's direction. Finally, when the men appeared distracted, Mr. Pilcher ran away into the woods. The men followed and fired shots after him. Mr. Pilcher hid in the woods for the rest of the night until he sought help from Mr. Cass.

Detective Claude Weatherford, on October 20, 2007, went to Cabrini Hospital to meet with detectives regarding the battery of an individual at an unknown location. Once at the hospital, Detective Weatherford talked to Mr. Pilcher then traveled to the location where he had been informed the incident had occurred. Detective Weatherford testified that, when he arrived on site where the battery took place, he observed Mr. Pilcher's vehicle was parked near the scene, and Detective Weatherford found evidence that was consistent with Mr. Pilcher's described events.

Detective Weatherford explained that, two days later, after being notified that a suspect had been located, officers photographed Defendant's black extended-cab truck. Defendant informed the officers that he and Mr. Greenwood had used two rifles that night and gave them consent to search. The officers collected the rifles from Defendant's bedroom. They collected a Remington seven millimeter magazine rifle. It appeared as if there was blood on the stock of the rifle. The second firearm collected was an SKS. The search also yielded spent cartridges in the back of Defendant's truck that matched the SKS rounds.

Detective Reed, who supervised the Tioga detectives for the Rapides Parish Sheriff's Office, was the next witness called by the State. On October 20, 2007, he spoke to Mr. Pilcher at Cabrini Hospital. Detective Reed recounted the information he obtained from Mr. Pilcher:

> He gave me his statement, which began -- that put him and some co-workers at GG's Club. They had met two guys. He knew one of

2

the[m] by the name of Darien, is what he had said. They were -- had told him that they were in the military. Darien had accused one of the persons with Josh of taking his cell phone. He lost his cell phone at the club. They -- there were some attempts to find the cell phone. Josh had told me that he loaned Darien his phone to try to call the lost phone to see if they could locate it. That never happened at GG's. Josh advised that Darien and the other person that was with Darien left GG's with his cell phone. He contacted them using his wife's cell phone. He called his own cell phone that Darien had, the guy he was calling Darien, and had made arrangements to meet them to get his cell phone back. Josh says that that [sic] was going to be on Messina Road. He told me that he went out to Messina Road. When he arrived[,] . . . the person he knew as Darien was in the passenger seat and another male was driving . . . . He says he got -- they were parked parallel. He says he got out of his vehicle, asked for his phone. The passenger told him he wasn't getting his phone. He said the guy that he knew as Darien got out, produced a rifle, which Josh believed to be an AK-47. He said he shot a round -- pointed it at him and then shot a round at his feet into the ground. He said during this, he said the driver got out and came around the truck. And I believe in his statement he said that they double-teamed him. He said he -- he fell to the ground. The -- the unidentified male at the time got on top of him, was yelling at him, cussing at him. Josh said he hit him, he struck him a few times, hit him. There was talk about him having a pistol, that he -- he said he had a Glock and he was going to shoot him, things like that. During that same time, Darien, the one identified as Darien at the time, came back on top of him with the other person, Darien was questioning him pretty strongly about the cell phone -- where's the cell phone. And when Josh would say, I don't know where your cell phone is, the one he knew as Darien would -- would stab him in his hand. Josh said that they had him pinned down flat, one arm behind his back and the other arm stretched out on the -- on the gravel road. He said at some point when they both -- when they both was [sic] off of him, that's when he was able to run off into the woods. And he stayed there until he -- I guess the next morning, when he was walking through the woods and came across a hunter.

Detective Reed said that, at the hospital, Mr. Pilcher had knife wounds to his hand and a laceration on his head. Mr. Pilcher reported being in a lot of pain. During his interview with Mr. Pilcher, Detective Reed learned that Mr. Pilcher had been robbed as well as beaten. Mr. Pilcher's wallet and cell phone had been taken.

After speaking with Mr. Pilcher, Detective Reed also went to the scene of the offenses. Mr. Pilcher's truck was still parked on the road near the scene of the

3

incident. Detective Reed observed while Detective Weatherford processed the scene. Detective Reed then obtained information through Mr. Pilcher's wife. Mrs. Pilcher had access to the cell phone bill, so she printed out a copy, which showed the numbers called by Mr. Pilcher's cell phone during the early morning hours of the twentieth. Detective Reed was able to call the numbers to find out who had been calling them from Mr. Pilcher's phone.

Detective Reed related that one of the calls was to Olivia West, who said her boyfriend, Darien Greenwood, had called her to say he lost his cell phone at a night club. Ms. West gave Detective Reed information on Mr. Greenwood and stated she was unable to contact him during the day because he was attending a military school. Detective Reed then put Mr. Greenwood into a lineup and showed it to Mr. Pilcher; Mr. Pilcher identified Mr. Greenwood as the man he knew as "Darien."

Detective Reed said that two days later he was contacted by a master sergeant from the Air National Guard as a result of a call from Defendant. Defendant had informed the master sergeant that he had knowledge of the incident. Detective Reed met with both the master sergeant and Defendant at Defendant's residence. Defendant was cooperative, and, after being read his rights, he consented to a search and gave a statement.

Detective Reed recalled that Defendant reported to having a role in the incident of protecting Mr. Pilcher, rather than harming him. Detective Reed did not immediately arrest Defendant because he wanted to consult Mr. Pilcher about the contents of Defendant's statement.

In his statement, Defendant stated that at GG's he and Mr. Greenwood met Mr. Pilcher and four Mexican contractors. Defendant discussed his plans with Mr. Pilcher

4

to later go out to Kisatchie, have a bonfire, drink, and shoot guns. Defendant continued that an incident involving Mr. Greenwood's cell phone happened at GG's:

> The Mexicans were in a separate vehicle other than Josh and they left like about...they left about the same time we did except they were taunting Darren because Darren called...used my cell phone to call the Mexicans' phones and I think it was Roberto or Richard, one of the guys in the truck that he called and he knew they had their cell phone because he could hear the music in the background. At that moment Josh..he understood everything and he understood the situation very well and he proceeded to give...he gave Darren his cell phone, his personal cell phone and said hey, I'm gonna call you from my wife's phone. I have my wife's phone, here you go, this is a good gesture. I'm gonna go find out what's wrong with them but I still wanta meet up with you guys cause I wanta hang out. I'm sorry that happened but we still wanta go drink beer and go have fun.

Defendant then invited Mr. Pilcher to Kisatchie. Defendant did not want the contractors to attend because he was afraid of further conversation between them and Mr. Greenwood though Mr. Greenwood seemed to have calmed down. When Defendant and Mr. Greenwood met Mr. Pilcher at Kisatchie, Mr. Pilcher got out of his vehicle. When Mr. Greenwood asked where his cell phone was, Mr. Pilcher said he had looked for it, but he was unable to locate the phone, so he did not have it. Defendant then stepped outside to relieve himself, and related that, when he turned back toward the truck, Mr. Greenwood had pointed Defendant's SKS at Mr. Pilcher and fired a single shot into the ground. Defendant said he put himself between the two men, and ended up knocking Mr. Pilcher to the ground because he wanted to cover Mr. Pilcher with his body. Mr. Greenwood continued to taunt Mr. Pilcher with the gun, and Defendant kept pushing the barrel away from Mr. Pilcher. Defendant recalled Mr. Pilcher being scared, but he did not know if Mr. Pilcher attempted to get away or told Defendant to let him up, as Defendant was also afraid.

5

Defendant then said that, after firing the initial shot, Mr. Greenwood had "butt stroked" Mr. Pilcher onto the ground. Defendant dragged Mr. Pilcher to the front of the vehicles to protect him from shots fired down range. Eventually, Mr. Greenwood handed Defendant the rifle; Defendant unloaded it and placed the shells in his pocket. Defendant went to back to his truck. When he returned, Mr. Greenwood was on top of Mr. Pilcher with a knife and had already cut Mr. Pilcher on the forehead. Defendant said he demanded that Mr. Greenwood get off of Mr. Pilcher, and he pleaded with Mr. Pilcher to tell Mr. Greenwood what he wanted to know.

Defendant said that Mr. Greenwood instructed him to grab Mr. Pilcher's wallet, and Defendant obeyed. Defendant was on Mr. Pilcher, as Mr. Greenwood continued to interrogate Mr. Pilcher about the cell phone. Mr. Greenwood stabbed Mr. Pilcher in the hand multiple times. Defendant, covered in blood, tried to stop Mr. Greenwood, but he did not want to get hurt. Defendant repeatedly told Mr. Greenwood to stop. Mr. Greenwood then mentioned that they could not leave Mr. Pilcher there, and they had to get rid of him. Defendant refused, got off of Mr. Pilcher, and walked to his truck. Mr. Greenwood took the keys from Mr. Pilcher's truck and kept them and the identification from Mr. Pilcher's wallet. Defendant did not know what Mr. Greenwood did with the actual wallet.

Defendant maintained that he had done things he should not have because Mr. Greenwood threatened him. Defendant said he told Mr. Pilcher it would stop if he gave Mr. Greenwood back his cell phone. Defendant denied ever hitting Mr. Pilcher, shooting at Mr. Pilcher, or stabbing him. Defendant only held him down and took his wallet. Defendant distracted Mr. Greenwood in the hope that Mr. Pilcher would flee. Mr. Greenwood said they had to kill Mr. Pilcher. After Mr. Pilcher ran away, Mr.

6

Greenwood insisted they find him and went walking in the woods. On the way back to Defendant's house, Mr. Greenwood told Defendant to not say anything about the incident. The last time Defendant saw Mr. Greenwood, Mr. Greenwood said he was going to get rid of the evidence.

The next morning, Defendant informed his roommate, a neighbor, and a family friend who was a corrections officer about what had happened. Eventually, Defendant also notified his superiors in the military.

After the introduction of Defendant's statement, Detective Reed resumed testifying. He talked to Mr. Pilcher about Defendant's statement before arresting Defendant for armed robbery and second degree aggravated battery.

On cross-examination, Detective Reed agreed that Mr. Pilcher had told him that Defendant pulled him in front of the truck and covered him. Mr. Pilcher also related to Detective Reed that Mr. Greenwood had held the knife to Mr. Pilcher's ear and threatened to cut it off. Mr. Pilcher said Mr. Greenwood took his wallet containing ten dollars and the cell phone. He also set forth that Defendant told Mr. Greenwood to stop and leave Mr. Pilcher alone. At the time he wrote the affidavit for the arrest warrant for Mr. Greenwood, Detective Reed had not had an opportunity to discuss Defendant's statement with Mr. Pilcher in detail.

Detective Reed said, when he spoke with Mr. Pilcher, Mr Pilcher let him know that he never felt as if Defendant was trying to protect him. Mr. Pilcher added that Defendant was very vocal and voiced threats during the entire incident. Detective Reed wrote an affidavit in support of an arrest warrant for Defendant a week after he wrote the one for Mr. Greenwood. The account varies from the first arrest warrant affidavit. The primary difference is that in the first affidavit, Detective Reed affirmed

7

that Defendant covered Mr. Pilcher; in the second, Detective Reed wrote that Defendant held Mr. Pilcher down.

On redirect examination, Detective Reed said he wrote the affidavit in support of arresting Mr. Greenwood after speaking to Defendant, and he issued the affidavit supporting the arrest of Defendant after he discussed Defendant's statement with Mr. Pilcher. The additional information required the corrections to the information contained in the first affidavit.

The State's sixth witness was the victim, Mr. Pilcher. In 2007, he was working for a landscaping company in Alexandria. He went out with a friend and some coworkers the Friday night before October 20, 2007. He and his companions eventually went to GG's where he spent most of the evening playing pool with a friend.

Mr. Pilcher said his friend Roberto was the first person who started talking to Defendant and Mr. Greenwood. Mr. Pilcher entered the conversation, and they seemed to "hit it off." Mr. Pilcher and the two men exchanged names and cell phone numbers. Near closing time, Mr. Greenwood realized his cell phone was missing, so Mr. Pilcher allowed Mr. Greenwood to use his cell phone to call the lost phone.

Mr. Pilcher testified he went to his vehicle in the parking lot, and he saw Defendant and Mr. Greenwood leaving in a black truck. Mr. Pilcher related that he had his wife's cell phone in his truck. Mr. Pilcher used his wife's phone to call his cell number and ask for his phone back. The men told him where to meet them, so he went to meet Defendant and Mr. Greenwood to retrieve his phone.

Mr. Pilcher explained that when he arrived at the designated location, he saw the black truck parked in the middle of the road, so he "pulled up" to within five feet,

8

turned off his engine, and exited his vehicle. Mr. Pilcher went to the window of the other truck and asked for his phone. Mr. Greenwood said Mr. Pilcher would not receive his phone until Mr. Greenwood's was returned. Mr. Pilcher protested that he did not have Mr. Greenwood's phone and that Mr. Greenwood was accusing the wrong person of having the device. Mr. Greenwood, who had an assault rifle across his lap, then pointed it at Mr. Pilcher. Defendant pushed it down and instructed Mr. Greenwood to not shoot inside the truck. Mr. Greenwood exited the truck and walked around to where Mr. Pilcher was standing.

Mr. Pilcher explained that Mr. Greenwood began yelling at him and asking for his cell phone. When Mr. Pilcher maintained he did not have the phone, Mr. Greenwood put the barrel of the rifle in Mr. Pilcher's face. In response, Mr. Pilcher pushed down on the barrel. Mr. Greenwood then stepped back and fired the rifle between Mr. Pilcher's feet. Mr. Pilcher became frightened and ran around the rear of the truck, as Mr. Greenwood followed. Mr. Pilcher stopped, turned back, and grabbed the rifle. A struggle ensued between Mr. Pilcher and Mr. Greenwood until Defendant struck Mr. Pilcher from behind, placed him in a chokehold, and held a pistol to his head.

Once Mr. Pilcher was in the chokehold, he stopped fighting over the weapon. Defendant then placed Mr. Pilcher into a wristlock and maneuvered him into a position where he was facedown on the ground. Mr. Pilcher was immobilized from the excruciating pain of the wristlock. Defendant knelt on Mr. Pilcher's back and placed one knee on his neck and the other in a position to maintain the wristlock. Defendant also put a hand on Mr. Pilcher's back.

9

Mr. Pilcher said that while Defendant was still holding him to the ground, Mr. Greenwood walked around and kicked Mr. Pilcher in the face. Defendant then instructed Mr. Greenwood to retrieve a knife from the truck. Thereafter, every time Mr. Pilcher cried, whimpered, or denied having the cell phone, he felt a blow on his hand. At the time, he did not know he was being stabbed, because his face was turned away from where the men were holding his hand. During this phase of the attack, Defendant shifted to sit on Mr. Pilcher's back. Mr. Pilcher thought it was Defendant who was damaging his hand because he could see Mr. Greenwood standing to his right, within his field of vision. Mr. Pilcher did not hear either man attempt to aid him, and neither man offered any reassuring words.

Mr. Pilcher recalled Defendant removing Mr. Pilcher's wallet from his back pocket. After taking Mr. Pilcher's wallet, Defendant threatened that, after they were finished with Mr. Pilcher, they would do the same things to Mrs. Pilcher. Mr. Pilcher thought the men might have seen the photograph of his wife that he used as a background on his cell phone screen. Besides the injuries to his hand, Mr. Pilcher had a cut on his right pinky finger and a long slit on his forehead, which had been inflicted when Defendant, who was sitting on Mr. Pilcher's back, pulled back Mr. Pilcher's head and sliced him with the knife across the forehead.

Mr. Pilcher related that, as Defendant punctured Mr. Pilcher's neck with the knife and insisted that he was going to cut off Mr. Pilcher's ear, Mr. Greenwood approached and stated that he thought he heard a car nearby. The two men "freaked out" and let Mr. Pilcher sit up while they prepared to move both trucks out of the road. Before they walked off, Mr. Greenwood reared back and struck Mr. Pilcher on the forehead with the rifle. Mr. Pilcher laid down and rolled over onto his side at the

10

edge of the ditch. When Mr. Pilcher heard his truck crank, he sprang to his feet and ran off into the woods.

Exhausted, Mr. Pilcher stopped running and took refuge in some bushes by a fallen tree. Mr. Pilcher stayed by the tree until he saw daylight. When it was light enough for him to see, he started working his way toward the highway. En route to the road, he encountered a deer hunter, Mr. Cass, out with his son, so Mr. Pilcher started crying and calling for help. Mr. Cass then drove Mr. Pilcher to a local hospital.

Detective Reed took a statement from him at the hospital. Mr. Pilcher thought he probably did not give Detective Reed a complete statement at the time because he was traumatized and embarrassed about some of the details because his wife was in the room.

Thomas Normand, with the Rapides Parish Sheriff's Office, was the first witness to testify for the defense. Deputy Normand received a call from Defendant around 5:00 a.m. on the morning of October 20, 2007. Defendant told Deputy Normand that he had witnessed a fight and was worried that it would affect his job. Deputy Normand went to Defendant's house a couple of days after the call, and, while there, spoke to Defendant, who denied being involved in the beating. Deputy Normand did not recall Defendant saying he tried to help the victim, but he did remember Defendant saying that he had not tried to hurt the man. On cross-examination, Deputy Normand explained that Defendant did not ask him to involve emergency services, that Defendant did not tell him they left the man hurt in the woods, and that Defendant did not mention a robbery or a stabbing. The purpose of Defendant's call to Deputy Normand did not include seeking assistance for Mr.

11

Pilcher. Over the telephone, Defendant sounded nervous, confused, disoriented, freaked out, and possibly drunk. Defendant was primarily worried that he would get into trouble.

Dr. John C. Simoneaux, an expert in forensic psychology, was another witness for the defense. Dr. Simoneaux examined the medical records in the instant case and the report prepared by Dr. Lonowski, an expert in clinical and forensic psychology. Dr. Simoneaux also interviewed and tested Defendant. Dr. Simoneaux agreed with Dr. Lonowski's diagnosis that Defendant suffered from post-traumatic stress disorder ("PTSD"), major depression, and alcoholism. Defendant reported to Dr. Simoneaux that he took protective action for both himself and the victim during the incident. Although Dr. Simoneaux could not tell whether Defendant's account was truthful, it seemed to be credible because it was fairly consistent. Dr. Simoneaux concluded Defendant's judgment was impaired by extreme intoxication. Although the incident provoked anxiety, Defendant's acute recall of the incident showed there was no disassociation. Dr. Simoneaux read his conclusion:

> the incident in question was a very anxiety provoking event, but it did . . . not . . . put Brock in a position where he was unaware of the wrongfulness of his acts. At the time of the alleged offense[,] Brock detailed various actions that he took that suggest[ed] very clearly he understood the situation he was in even though he was anxious and intoxicated, he took protective actions for both himself and others.

On cross-examination, Dr. Simoneaux maintained that the incident did not put Defendant in a position where he was unaware of the wrongness of his actions. Dr. Simoneaux did not believe that Defendant had a psychotic disassociative episode. Defendant was certainly not psychotic and knew that the events constituted criminal activity. The actions Defendant described himself as taking were almost heroic. He clearly knew right from wrong at the time. This conclusion was supported by the

12

actions Defendant took that showed he was aware of the matter's legal implications. His lack of judgment seemed to arise more from his voluntary intoxication than his PTSD.

Defendant then testified in his own defense. Defendant enlisted in the Air National Guard in 2003, and he was activated to duty during Hurricane Katrina in 2005. After Hurricane Katrina, he was offered an active duty position in the Guard Reserve for the Louisiana International Guard in Alexandria.

Defendant said he had been shot at during his deployment for Hurricane Katrina and was considered a disabled veteran because of his PTSD. Defendant started drinking heavily after Hurricane Katrina, and since then, he sought treatment for his alcohol problem. Defendant had been confined to three different hospitals on three different occasions since the incident.

Defendant said he met Mr. Greenwood either the evening of the incident or the day before. Defendant's first impression of Mr. Greenwood was that Mr. Greenwood was a good guy, so they decided to go out together and ended up at GG's Club where they met Mr. Pilcher. Defendant was intoxicated. Defendant, Mr. Greenwood, and Mr. Pilcher conversed about guns and video games. Defendant and Mr. Greenwood drunkenly argued about who was a better shot, so they decided to go shoot guns in the woods later that evening. Mr. Pilcher planned to follow them there.

Defendant said that, around closing time, Mr. Greenwood realized he lost his cell phone. At first, Mr. Greenwood was upset, but it was not "too dramatic." Defendant let Mr. Greenwood borrow his phone to call the lost device.

Defendant explained that they then went to Messina Road in the Kisatchie National Forest where they waited for Mr. Pilcher. Defendant said that after Mr.

13

Pilcher stopped in the road, he exited his truck and walked toward the driver's side of Defendant's vehicle. Mr. Greenwood asked Mr. Pilcher about the missing phone while Defendant exited his truck. Defendant stated that he then walked in front of Mr. Pilcher's truck to "use the bathroom" and smoke a cigarette. Mr. Pilcher and Mr. Greenwood talked while Defendant was otherwise occupied. Defendant heard a gunshot and dropped to the ground. When he stood back up and turned around, Defendant saw Mr. Greenwood aiming a smoking rifle barrel in his and Mr. Pilcher's direction. Defendant responded by inserting himself between Mr. Pilcher and Mr. Greenwood and taking Mr. Pilcher "into cover." This entailed forcing Mr. Pilcher to the front of Mr. Pilcher's vehicle and falling on top of him. Defendant asserted that, before he reached Mr. Pilcher, Mr. Greenwood struck Mr. Pilcher in the head with a gun.

Defendant recounted that the situation then calmed down. Mr. Greenwood handed Defendant the rifle. Defendant immediately unloaded the firearm. He thought the incident was over, so he stood up and returned the rifle to his truck. When he turned around, he saw Mr. Greenwood on top of Mr. Pilcher. Defendant then observed Mr. Greenwood cut Mr. Pilcher's head and stab him around his ear and eye. Defendant continued that he ran toward the pair, pushed Mr. Greenwood off Mr. Pilcher, and put his own body back on top of Mr. Pilcher.

Defendant related that Mr. Greenwood returned with the rifle and held it over both Defendant's and Mr. Pilcher's heads. Mr. Greenwood instructed Defendant to give him Mr. Pilcher's wallet, and Defendant complied. Defendant professed that he took Mr. Pilcher's wallet because he feared for his own life:

> While the weapon was being pointed, it was being pointed at both of us, because he was waving it over our heads, because Josh was laid down

14

and I was laid down on top of him. And at that moment, I felt that I was in fear of my own life as well, because . . . I was scared and I had no idea . . . who this guy was, like who Greenwood was. I mean, I knew him for a day[.]

Defendant said Mr. Greenwood suddenly stopped what he was doing and walked away. Defendant followed him and found Mr. Greenwood talking on a cell phone on the other side of Defendant's vehicle. Defendant took the weapon from Mr. Greenwood, put it back in his truck, and told Mr. Greenwood to leave Mr. Pilcher alone. Mr. Pilcher ran away, and Mr. Greenwood pursued. Mr. Greenwood also fired a couple of shots after Mr. Pilcher. Though Mr. Greenwood stated and restated that they had to kill Mr. Pilcher, Defendant insisted they leave, so they left after Mr. Greenwood wiped down the interior of the truck. Once he reached his home, he called Thomas Normand, who worked as a corrections officer for the Rapides Parish Sheriff's Office.

Finally, Defendant maintained that his actions had been designed to protect Mr. Pilcher and himself. They had not been designed to harm Mr. Pilcher. Defendant felt as if he were also in danger.

On cross-examination, Defendant agreed that there was a time during the incident after Mr. Greenwood handed him the rifle where Defendant was holding it while Mr. Greenwood was unarmed. Defendant also knew that Mr. Pilcher's life was in danger while Mr. Greenwood had the rifle, but he felt that the danger passed once Defendant obtained possession of the weapon and unloaded it. Defendant blamed his intoxication for his failure to use the loaded rifle to take charge of the situation as well as for his failure to get off of Mr. Pilcher at the time in order to allow Mr. Pilcher to escape. Defendant said he thought Mr. Pilcher was a liar and had lied about

15

Defendant's involvement in the offenses. Defendant did not know what would motivate Mr. Pilcher to lie at trial.

Dr. Daniel Lonowski next appeared as a defense witness. Dr. Lonowski opined that Defendant suffered from PTSD as well as alcohol dependence arising from his attempts to cope with the symptoms of PTSD and depression.

Dr. Lonowski related that Defendant had given him a clear, concise, and consistent account of what had happened on the evening of the incident. Defendant stated that he had acted to protect Mr. Pilcher. Defendant never deviated from the concept of protection. Dr. Lonowski explained that he had never before seen or heard of a report where the cruel and vicious behavior exhibited during the offenses was attributed to Defendant, so his findings were based solely on Defendant's account that he was acting to protect Mr. Pilcher. In addition to the alcoholism and PTSD, Dr. Lonowski found Defendant had a diminished capacity to make reasoned decisions. Dr. Lonowski thought Defendant only developed an understanding of wrongdoing after the fact.

On cross-examination, Dr. Lonowski explained that he did not think Defendant had criminal intent during the offenses though Defendant behaved in a criminal manner by putting his hands on the victim and restraining him. Dr. Lonowski reiterated that he did not think Defendant had an awareness that his actions could be construed as wrong until after the fact. Defendant felt he was doing the right thing at the time.

Mr. Pilcher was called to testify in rebuttal. Mr. Pilcher asserted he had no reason to lie against Defendant. He had never met Defendant before, and no one had threatened or intimidated him into giving his testimony. Mr. Pilcher maintained that

16

Defendant was the person who robbed him, cut him, hit him, and cursed him. Mr. Pilcher heard Defendant's testimony and recognized his voice from the night of the crimes. While Mr. Pilcher was lying on the ground whimpering and crying, Defendant leaned down and threatened to kill him if he did not "shut up."

Mr. Pilcher declared that he had been as truthful as he possibly could:

> I'm telling you everything as well as I can remember how it went down. I mean, there's details that I know I probably forgot to mention, or there's details that know I've mentioned that I forgot to mention in my report -- in the -- in the report to the officers. But everything that I'm telling right now is, I mean, is truth and has always been the truth.

On February 1, 2010, the trial court found Defendant guilty as charged without issuing reasons for its ruling.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find that there are no errors patent; however, the sentencing minutes require correction.

The sentencing minutes indicate Defendant's ten-year sentence for aggravated second degree battery was imposed without benefit of parole, probation, or suspension of sentence; however, the sentencing transcript contains no such restriction on benefits. When the transcript and court minutes conflict, the transcript prevails. *State v. Colton*, 07-252 (La.App. 3 Cir. 10/31/07), 968 So.2d 1239, *writ denied*, 07-2296 (La. 4/25/08), 978 So.2d 364. Additionally, we note that there is no restriction on benefits required by La.R.S. 14:34.7. Thus, the trial court is instructed to delete the provision in the sentencing minutes which states that Defendant's sentence is to be without benefit of parole, probation, or suspension of sentence.

17

**DISCUSSION:**

Defendant argues, "[t]he trial court erred in finding that the evidence was sufficient to prove the defendant was guilty." Defendant urges that the State failed to satisfy its burden of proving general criminal intent to commit the armed robbery and specific criminal intent to commit the aggravated second degree battery. Defendant maintains that the evidence shows he acted only to protect the victim. Therefore, Defendant asserts his actions were justified based upon his subjective belief that he was acting to protect both the victim and himself.

In his second assignment of error, Defendant asserts, "[t]he trial court erred in rejecting uncontradicted expert testimony as to the issues of intent and justification as a defense." Defendant adds that the uncontested testimony of the defense's psychological experts successfully refuted any inference of criminal intent. Defendant maintains that the evidence shows he acted only to protect the victim.

The State responds that Defendant's actions were those of a full participant in the offenses rather than someone acting to protect the victim. The State asserts that the facts do not fit a justification or necessity defense. The State adds, moreover, that the facts support the trial court's determination.

CREDIBILITY DETERMINATIONS:

Defendant argues that the trial court should have believed the testimonies given by him and his psychologists over the account given by the victim in the matter. It is not the function of the appellate court to reassess credibility of witnesses or reweigh evidence:

> [The supreme court has] repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second

> guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law."

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted). "The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007).

Although there may have been some inconsistencies between Mr. Pilcher's prior statements and his testimony, Defendant's report of the event also contained discrepancies. For example, Defendant asserted that, after he unloaded the firearm and returned it to the truck, Mr. Greenwood used the rifle to intimidate him into taking Mr. Pilcher's wallet. Defendant asserted he was afraid for his life, when he had already removed the ammunition. Further, Mr. Pilcher had no motive to lie; however, Defendant's freedom rested upon his ability to convince the trial court of his version of events. Both of the psychologists who testified at trial stated that their conclusions had been based solely upon the account of events given by Defendant and did not include any other versions of the incident. Moreover, Dr. Simoneaux clearly expressed that Defendant knew the difference between right and wrong at the time of the crimes.

Defendant presented a justification defense by testifying that he acted only to protect Mr. Pilcher, but the district court clearly did not believe Defendant. Instead,

19

the trial court believed Mr. Pilcher's version of events. Mr. Pilcher's testimony showed that, rather than protecting Mr. Pilcher, Defendant was the person who committed the crimes while Mr. Greenwood stood nearby and occasionally assisted. As it is not clearly contrary to the evidence, the trial court's credibility determination was within the bounds of rationality. Thus, the trial court's finding of credibility did not constitute an abuse of discretion.

SUFFICIENCY OF THE EVIDENCE:

The defense also asserts that the prosecution failed to meet its burden of proving Defendant committed the offenses for which he was convicted. The Louisiana Supreme Court has discussed the standard of review for evaluating the sufficiency of the evidence on appeal:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

Defendant challenges his conviction for aggravated second degree battery, which is defined as follows:

> (1) Aggravated second degree battery is a batter committed with a dangerous weapon when the offender intentionally inflicts serious bodily injury.

> (2) For the purposes of this Section, "serious bodily injury" means bodily injury which involves unconsciousness, extreme physical pain or

20

protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death.

La.R.S. 14:34.7(A). "Battery is the intentional use of force or violence upon the person of another. . . ." La.R.S. 14:33.

The evidence most favorable to the prosecution shows that Defendant put Mr. Pilcher in a chokehold, forced him facedown on the ground, restrained him in that position, had Mr. Greenwood retrieve a knife from his truck, and then used the knife to stab Mr. Pilcher repeatedly in the hand as well as cut Mr. Pilcher's face and head. Mr. Pilcher cried and whimpered during the attack. At the time of trial, Mr. Pilcher had multiple scars on his hand from the attack; despite surgery, Mr. Pilcher never regained full function of his hand because his middle finger had lost sensation and strength. Additionally, at the time of trial, Mr. Pilcher continued to be mentally affected by the incident; he continued to dwell on and have nightmares about the matter.

Defendant also contests his conviction for armed robbery. "Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by the use of force or intimidation, while armed with a dangerous weapon." La.R.S. 14:64(A). The evidence most favorable to the prosecution shows that, after stabbing Mr. Pilcher in the hand but prior to cutting Mr. Pilcher's neck and threatening to cut off his ear, Defendant removed Mr. Pilcher's wallet, containing identification and ten dollars, from his back pocket. Thus, the record shows that Defendant was still armed with the knife when he took Mr. Pilcher's wallet.

21

In *State v. Hampton*, 38,017 to 38,020, p. 1 (La.App. 2 Cir. 1/28/04), 865 So.2d 284, 287, *writ denied*, 04-834 (La. 3/11/05), 896 So.2d 57, *and writ denied*, 04-2380 (La. 6/3/05), 903 So.2d 452, the defendants were convicted of both aggravated second degree battery and armed robbery. Defendant Hargrove drove a vehicle up to the victim's driveway and made a sudden stop, Defendant Hampton exited the passenger side of the automobile, aimed a pistol at the victim, and approached him demanding money. *Id*. at 288-89. Once near the victim, Hampton knocked the victim to the ground by striking him about the face and head several times with the pistol. *Id*. at 288. The blows created several large gashes on the victim's forehead and nose. *Id*. When the victim was on the ground, Hampton took credit cards, a money clip, and cash from the victim's pocket. *Id*. Hampton then returned to the passenger side of the vehicle, and Hargrove drove them away. *Id*. Based on the facts of the case, the second circuit found that a rational trier of fact could have found that the State proved the essential elements of the crimes beyond a reasonable doubt and affirmed the convictions for both of the defendants. *Id*. at 292.

Therefore, when viewed in the light most favorable to the prosecution, the State, in the current case, introduced sufficient evidence to prove the essential elements of both aggravated second degree battery and armed robbery beyond a reasonable doubt. Accordingly, Defendant's assignments of error are without merit.

**DECREE:**

Defendant's convictions and sentences are affirmed. The trial court is instructed to delete the provision in the sentencing minutes which states that Defendant's sentence for aggravated second degree battery is to be without benefit of parole, probation, or suspension of sentence.

**AFFIRMED.**