MOORE, J.
|,The defendant, Kattie Rosettia Jackson, was convicted of aggravated battery in violation of La. R.S. 14:34, for slashing the arm of the victim with a box cutter during a scuffle. The trial court sentenced Jackson to five years imprisonment at hard labor. The defendant now appeals her conviction and sentence. For the following reasons, we affirm.
Facts
Around 2:00 a.m. on August 16, 2010, Mikaylia Taylor was at her Shreveport home celebrating the birthday of Bianca Darby, the girlfriend of her brother Sank-eyno. Several other guests were present, including her half-brother and half-sister, Jemario Calais and Keyera Calais, and a friend of Bianca’s, Lasheonia Wilson. The defendant was not invited to the party even though she was involved in a relationship with Jemario Calais at the time. Jemario was the father of the defendant’s one-year-old baby and an unborn child that the defendant was carrying.
Although the defendant was not at the party, two of her cousins were seen driving past the house twice. A short time later the defendant suddenly appeared at the front door and angrily demanded to know who Jemario was “hugged up with.” Mi-kaylia and the others told the defendant several times to leave the premises. Tensions escalated and guests began to congregate outside the front of the house as Jemario forcefully led the defendant out to her car. Near her car the defendant began arguing with Lasheonia Wilson, whom she accused of being the woman “hugged up with” with Jemario. She retrieved an object from her car and began chasing Wilson in the front yard. Some of the witnesses realized that the defendant 1 ahad a blade in her hand.
The defendant fell down as she crossed a ditch while chasing Lasheonia, who ran to the side of the house and entered through a side door. When the defendant got up, she charged Mikaylia Taylor, who had walked into the front yard and was unaware that the defendant was armed. The two women began fighting. Shortly after the scuffle began, Mikaylia noticed that her arm was numb, and she was bleeding. She retreated to her house, and the defendant fled the scene.
Police were summoned to the disturbance. They spoke with the injured Mi-kaylia Taylor regarding the incident. They found the box cutter on the lawn and interviewed Jemario Calais, Keyera Calais and Bianca Darby, each of whom corroborated the victim’s account.
The defendant was arrested on August 17, 2010, for her part in the incident. Detective Shaunda Holmes of the Shreveport Police Department interviewed the defendant. She was later charged by bill of information with aggravated battery in violation of La. R.S. 14:34. Defendant came for trial before a jury on April 12, 2011.
After a one-day trial, the jury returned a verdict of guilty as charged. The defendant filed post-trial motions for new trial and for a post verdict judgment of acquittal, both of which were denied. The defendant was sentenced on April 18, 2011, to five years’ imprisonment at hard labor. After sentencing, the defendant filed a written motion to reconsider sentence *177 which the record does not indicate was ever ruled upon.
|sThe defendant now appeals her conviction and sentence, raising two assignments of error and two errors patent related to her sentence. Because the errors patent concern the defendant’s sentence, we shall first consider the defendant’s sufficiency of evidence claim regarding her conviction.
Discussion
By her first assignment of error, the defendant alleges that the evidence adduced at trial is insufficient to sustain her conviction. She argues that her arrest and subsequent conviction was obtained as a result of poor police work: the box cutter was not examined for fingerprint identification and the police simply accepted Mi-kaylia’s version of the events. The defendant maintains that she went to the house only because Jemario asked her to bring his son to him. After she arrived, she was attacked by Lasheonia Wilson and the victim, Mikaylia, who, defendant claims, wielded the box cutter and accidentally cut herself in the struggle that ensued. After she left but before the police came, Mikay-lia convinced Keyera Calais and Bianca Darby to tell Officer Gary Holmes that the defendant attacked her with the box cutter and even told Officer Holmes that Jemario Calais was her boyfriend, thereby inferring that the defendant attacked her out of jealousy.[1]
At oral argument, counsel argued that the state’s witnesses at trial were not credible because of inconsistencies in their testimony regarding possession of the box cutter. For example, Mikaylia said she did not see the box cutter, while Keyera and Bianca said they saw the defendant holding a |4blade. For these reasons, counsel urges in her brief that the appellate court should impinge on the jury’s discretion and role in determining the credibility of the witnesses to guarantee that fundamental due process requirements are met, citing State v. Mussall, 523 So.2d 1305 (La.1988). (Emphasis ours).
In reviewing the sufficiency of the evidence to support a conviction, the reviewing court must determine if the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all the elements of the crime had been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App. 2 Cir. 1/9/08), 974 So.2d 181, writ denied, 2008-0499 (La.11/14/08), 996 So.2d 1086.
The Jackson v. Virginia doctrine, which is now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App. 2 Cir. 1/14/09), 1 So.3d 833. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App. 2 Cir. 2/25/09), 3 So.3d 685; State v. Hill, 42,025 (La.App. 2 Cir. 5/9/07), 956 5So.2d 758, writ denied, 2007-1209 (La.12/14/07), 970 So.2d 529. See also, State v. Shivers, 43,731 (La.App. 2 Cir. 12/3/08), 998 So.2d 877, 883 (same deference applies to bench trial).
*178 “The principal criterion of a Jackson v. Virginia review is rationality.” State v. Mussall, supra at 1310. Due process demands that a criminal conviction cannot constitutionally stand if it is based on a record from which no rational trier of fact could find guilt beyond a reasonable doubt. This is why, under Jackson, the reviewing court views the evidence “from the perspective of a hypothetical rational trier of fact” to determine if an unconstitutional conviction has occurred. Id. As the Louisiana Supreme Court stated:
In reviewing the evidence, the whole record must be considered because a rational trier of fact would consider all of the evidence, and the actual trier of fact is presumed to have acted rationally until it appears otherwise. (Citation omitted). If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. (Citation omitted.)
Id. at 1310.
The trier of fact is charged to make a credibility determination and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact finder’s discretion only to the extent necessary to guarantee the fundamental due process of law. State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022; State v. Mussall, supra. (Emphasis ours).
LThe Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied, 2009-0372 (La.11/6/09), 21 So.3d 299; State v. Parker, 42,311 (La.App. 2 Cir. 8/15/07), 963 So.2d 497, writ denied, 2007-2053 (La.3/7/08), 977 So.2d 896.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Allen, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, writs denied, 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
Louisiana Revised Statute 14:34 defines aggravated battery as “a battery committed with a dangerous weapon.” Battery is “the intentional use of force or violence upon the person of another; or the intentional administration of a poison or other noxious liquid or substance to another.” La. R.S. 14:33. Further, as defined in La. R.S. 14:2(A)(3), a “dangerous |7weapon” is “any gas, liquid, or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm.”
Five witnesses testified for the prosecution at the trial of this case. Only *179 the defendant testified in her defense. We summarize the trial testimony as follows:
Gary Holmes of the Shreveport Police Department testified that he and a companion officer responded to a disorderly person call in the early morning hours of August 16, 2010, at 2602 Hassett Avenue in Shreveport, Louisiana. They found Mi-kaylia Taylor standing in the front yard “bleeding profusely” from her right arm. Officer Holmes said Mikaylia told him that the defendant came to her house in an agitated state looking for Mikaylia’s boyfriend, Jemario.[2] When the defendant was told to leave, she produced a blue box cutter and struck Mikaylia with it. Holmes found a blue-handled box cutter resting on the front lawn. The defendant had left the premises. According to Officer Holmes, three other individuals on the scene, Jemario Calais, Keyera Calais and Bianca Darby, corroborated Mikaylia’s version of the events told to Holmes.
Mikaylia Taylor testified that earlier in the evening she noticed the defendant’s cousin, Brittany Jackson, drive by her home twice with her sister. Shortly thereafter, the defendant appeared at her front door demanding to know from Jemario “what ‘B’ he was ‘hugged up’ with.” Mi-kaylia testified that they repeatedly told the defendant to leave, but she | ¡¡did not do so. The defendant was angry and cursing at everyone.
Mikaylia testified that Jemario led the defendant toward her car parked on the street. Everyone moved outside to observe what was going on. When Jemario and the defendant were at the car, she saw the defendant begin to chase Lasheonia Wilson, apparently believing Wilson to be the woman Jemario was “hugged up with.” The defendant fell during the chase, at which point Mikaylia began to walk into the yard from where she was standing at her front door. As she did so, Mikaylia indicated that the defendant began running towards her. The two women started swinging at each other. Shortly after the altercation began, Mikaylia said she felt her arm go numb and looked down to find her arm had been cut. Mikaylia testified that her sister went in to call 911 while Mikaylia retreated into the house to get something for the wound. During this time, the defendant fled the scene. Mi-kaylia testified that she was unaware the defendant had a weapon until she had been cut.
Mikaylia then identified the photographs taken at the hospital of her injuries and placed into evidence. The most serious wound reflected in the photographs is a deep gash in the subject’s right forearm which Mikaylia testified required four levels of stitching. Another photograph depicts a cut across the palmar aspect of the subject’s middle and ring fingers. Other photographs depict superficial injuries to the victim’s forehead, cheek and legs, and blood splattered on her clothing.
Bianca Darby testified that she was at Mikaylia Taylor’s home on August 16, 2010, celebrating her birthday. At the time, Darby was dating | nSankeyno Taylor, one of the victim’s brothers. Darby asserted that there were approximately ten people in attendance. At around 2:00 a.m., the defendant arrived and knocked on the door which was answered by Keyera Calais. According to Darby, the defendant was cursing and asking which of the individuals present was there for Jemario. As Jemario forced the defendant back to her car, everyone gathered in front of the house. The defendant then retrieved something from the car. Jemario screamed that she had a blade when she *180 started chasing Wilson. The defendant slipped and fell in the yard. When she got back up, she went after Mikaylia who, she said, was standing by Jemario and Keyera. After a short scuffle, they were pulled apart, and Mikaylia commented that she had been cut. Darby stated that no one had attacked the defendant prior to her cutting Mikaylia. Although she did not see the box cutter, she said that she did see the silver part of the blade. She did not recall whether she had given a statement to the police.
The victim’s sister, Keyera Calais, testified that she lived with Mikaylia and was present on the evening in question. She testified that when the defendant came to the front door, she was upset and asked Keyera where Jemario was. Jemario came to the door and told the defendant to go home because she had their one-year-old son in the car. As he led her back to the car and the argument got louder, everyone came outside, including Lasheonia. The defendant, referring to Lasheonia, said that she must be the woman Jemario was “hugged up with.” The defendant got something from her car, presumably the box cutter, and chased Lasheonia with a blade. She 11flfell while crossing the ditch. When the defendant got up, she charged Mikaylia. The two women started to fight and Mikaylia’s arm was cut. Keyera said that she tried to break up the fight. In the process, Keyera turned her back to the defendant. She subsequently learned that the back of her shirt had been cut open. She said that no one had attacked the defendant prior to the fight.
Detective Shaunda Holmes testified that she took a statement from the defendant the day after the incident. After she advised the defendant of her Miranda rights, the defendant told Detective Holmes that Jemario Calais called her at 1:00 a.m. to bring their son for a visit. She went over to the victim’s home where she was jumped by a couple of girls. Defendant claimed that, during the altercation, Mi-kaylia was wielding a box cutter and that the defendant cut her hand while trying to disarm Mikaylia.
Detective Holmes also interviewed Mi-kaylia, who contradicted the defendant’s version of events. Detective Holmes admitted that she interviewed no other witnesses, but was aware that the responding officers had interviewed the witnesses on the scene. Detective Holmes also testified that, to her knowledge, no fingerprint analysis was conducted on the recovered box cutter.
The defendant took the stand in her own defense. She testified that Jemario called her at approximately 1:00 a.m. and asked her to bring their son over so he could see him. When she arrived, she went to the door and asked Keyera to get Jemario. When Keyera said “something smart,” the defendant started to walk back to her car and was joined by Jemario. Then lnLasheonia, whom the defendant did not know at the time, came up and said “that she was the ‘B’ who he was with.” When defendant asked Jemario if it was true, Jemario told her to leave and they began to argue. Defendant said that Jemario started to choke her and let go after about five seconds, at which time Lasheonia ran up and struck the defendant in the side of the head with her fist. That is when the defendant claims she started to chase Lasheonia and fell in the yard. As she got up, defendant said she told Mikaylia that she “down bad,” after which Mikaylia charged her with “something in her hand.” Defendant had no idea how Mikaylia got the cut on her arm but said the scratches to Mikaylia’s face came from the defendant’s rings. She could only speculate that the cuts received by both herself and Mikaylia took place as they struggled for *181 whatever Mikaylia had in her hand. She said she then left the scene because her one-year-old son, who had been sitting in the vehicle, was screaming.
After review, we conclude that the testimony at trial simply consisted of two different versions of the altercation in front of Ms. Taylor’s home. While the defendant claimed that she acted in self-defense, it was her burden to prove this affirmative defense.
We find no reason to conclude that the jury acted outside the bounds of rationality in rendering its verdict based upon its obvious acceptance of the prosecution witnesses’ version of events. The fact that Officer Holmes testified that Mikaylia told him that Jemario Calais was her boyfriend instead of her brother could have been regarded by the jury as simply a misunderstood communication — certainly given the circumstances in which |12Mikaylia gave her statement to Officer Holmes right after the incident while she was bleeding profusely from the serious slash in her arm. Similarly, Mikaylia’s testimony that she did not know the defendant was armed with a box cutter even though her sister and friend testified that they saw the blade is neither incredible nor even unusual under the circumstances. It was within the jury’s purview to conclude that the defendant was the aggressor in the altercation and that she did not act in self-defense. See State v. Lafitte, 10-1253 (La.App. 3 Cir. 5/11/11), 63 So.3d 1195.
We therefore conclude that, interpreting all of the evidence most favorable to the prosecution, a rational trier of fact could have found the essential elements of aggravated battery were proven beyond a reasonable doubt.
This assignment is therefore without merit.

Sentencing

Before reviewing the assigned sentencing error, we note that the defendant assigns two errors patent, namely, the trial court failed to rule on her motion to reconsider sentence and it failed to advise her of the time delays for filing post-conviction relief.
Regarding the failure of the court to rule on a motion to reconsider sentence, this court held in State v. Lathan, 41,855 (La.App. 2 Cir. 2/28/07), 953 So.2d 890, writ denied, 2007-0805 (La.3/28/08), 978 So.2d 297:
According to La. C. Cr. P. art. 916(3), the trial court retains jurisdiction to “take other appropriate action pursuant to a properly made or filed motion to reconsider sentence” even after an order of appeal is entered. Further, La. C. Cr. P. art. |1S881.1(C) states that “the trial court may resentence the defendant despite the pendency of an appeal or the commencement of execution of that sentence.” In addition, no provision within the Code of Criminal Procedure prohibits an appellate court from reviewing a sentence for constitutional excessiveness in spite of the trial court’s failure to rule on a motion to reconsider sentence. Further, an appellate court may review a sentence for constitutional excessiveness even if the defendant fails to file a motion to reconsider sentence. Therefore, this court may review Defendant’s sentence for constitutional excessiveness in spite of the pending motion to reconsider sentence. Should the trial court later rule upon Defendant’s motion to reconsider sentence, Defendant may seek appellate review of that decision pursuant to La. C. Cr. P. art. 914(B)(2).
Thus, the absence of a ruling on the motion to reconsider sentence does not affect this court’s ability to consider the constitutional excessiveness of the defen *182 dant’s sentence on appeal nor does it require a remand, since the trial court retains jurisdiction to rule on the motion to reconsider sentence and the defendant is within her rights to provoke same. Should the trial court later rule upon defendant’s motion to reconsider sentence, the defendant may seek appellate review of that decision pursuant to La. C. Cr. P. art. 914(B)(2). State v. Lathan, supra.
As to the trial court’s failure to advise regarding post-conviction relief, the sentencing transcript reflects that the trial court did not advise the defendant of the time period within which to apply for same. The Louisiana Supreme Court has held that La. C. Cr. P. art. 930.8(C), which requires the trial court to inform the defendant of the limitations period for filing an application for post-conviction relief, is supplicatory language which does not bestow an enforceable right on an individual defendant. State ex rel. Glover v. State, 93-2330 (La.9/5/95), 660 So.2d 1189, abrogated on other \ ugrounds in State ex rel. Olivieri v. State, 2000-0172 (La.2/21/01), 779 So.2d 735; State v. Hunter, 36,692 (La.App. 2 Cir. 12/20/02), 834 So.2d 6. The trial court should have advised defendant, but this court can also advise her. See State v. Pugh, 40,159 (LaApp. 2 Cir. 9/21/05), 911 So.2d 898.
By her second assignment of error, the defendant alleges that the sentence of five years at hard labor is excessive under the facts and circumstances of this case. She contends that the trial court disregarded the mental and emotional well-being of defendant’s children in imposing her sentence. Despite her volatile relationship with the father of her children, she was doing her best to ensure that he remained a part of his children’s lives.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, supra. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App. 2 Cir. 8/13/08), 989 So.2d 267. The important elements which should be | ^considered are the defendant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App. 2 Cir. 8/13/08), 989 So.2d 259, writ denied, 2008-2341 (La.5/15/09), 8 So.3d 581. There is no requirement that specific matters be given any particular weight at sentencing. State v. Shumaker, 41,547 (La.App. 2 Cir. 12/13/06), 945 So.2d 277, writ denied, 2007-0144 (La.9/28/07), 964 So.2d 351.
Second, a sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, *183 it shocks the sense of justice. State v. Weaver, 2001-0467 (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La.1992); State v. Robinson, 40,983 (La.App. 2 Cir. 1/24/07), 948 So.2d 379; State v. Bradford, 29,519 (La.App. 2 Cir. 4/2/97), 691 So.2d 864. La. C. Cr. P. art. 881.1 applies to defendant’s sentence. This article precludes the defendant from presenting sentencing arguments to the court of appeal which were not presented to the trial court. In such a circumstance, the defendant is simply relegated to having the appellate court consider the bare claim of constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993); State v. Masters, 37,967 (La.App. 2 Cir. 12/17/03), | 16862 So.2d 1121; State v. Duncan, 30,453 (La.App. 2 Cir. 2/25/98), 707 So.2d 164.
Aggravated battery is punishable by a fine of not more than $5,000, imprisonment with or without hard labor for not more than 10 years, or both. La. R.S. 14:34.
While imposing the defendant’s sentence, the trial court noted that the defendant had a prior conviction for simple battery which had been pled down from a more serious charge, and that the defendant had inflicted serious injury with her conduct. The court found that the defendant was in need of a custodial environment as she appears to have a temper problem which makes her a risk to the public. While the court stated that the defendant’s conduct may have been provoked by jealousy upon learning that the father of her children might have been involved with another woman, the court found that fact was not justification for her conduct. When defense counsel asked the court to reconsider the sentence in light of the defendant’s obligation to her two young children, the court stated that the defendant’s conduct on the night of the incident indicated that the children would “be at least as safe with someone else while she’s in jail.”
The defendant presented no evidence of mitigating circumstances for the court to consider. While the facts presented ah trial informed the court that the defendant had one young child and was pregnant with another at the time she committed her crime, the court was within its discretion to accord marginal weight to the hardship defendant’s imprisonment would impose on her dependents. The trial court’s comment regarding her choice to take her | i7one-year-old son out at 1:00 o’clock in the morning to confront the child’s father about being with another woman, characterized by the defendant as “snide,” makes a valid point. Bringing an infant to a party at 1:00 a.m., whether it was carried out to either track his father down or make sure he is involved in the child’s life, was perhaps not the best decision.
The trial judge stated that he considered all of the appropriate factors and considered this to be a very serious crime causing serious injury that could have had a deadly result. In closing, the court noted that the defendant had refused to take any responsibility for her conduct.
This record supports the finding that the sentence of defendant is not unconstitutionally excessive. When defendant’s crime and sentence are viewed in light of the harm done to society by violent crimes, her five-year hard labor sentence does not shock our sense of justice.
This assignment is therefore without merit.
CONCLUSION
For the reasons stated above, the defendant’s conviction and sentence are affirmed. The defendant is hereby advised that no application for post-conviction relief, including applications which seek an *184 out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C. Cr. P. arts. 914 or 922.
CONVICTION AND SENTENCE AFFIRMED.

. Officer Holmes insisted at trial that Mikay-lia told him Jemario was her boyfriend.

. Jemario is actually Mikaylia’s brother and the defendant’s boyfriend.